[No. 48351-5. En Banc. February 24, 1983.]

THE STATE OF WASHINGTON, *Petitioner*, v. ALLEN
DALE HUDLOW, *Respondent.*

THE STATE OF WASHINGTON, *Petitioner*, v. DOUGLAS
B. HARPER, *Respondent.*

*C. Danny Clem, Prosecuting Attorney,* and *Patricia A. Toth, Deputy,* for petitioner.

*Ronald D. Ness* and *Robert Jenness Banghart,* for respondents.

*Betsy R. Hollingsworth* on behalf of Northwest Women's Law Center, amicus curiae for petitioner.

WILLIAMS, C.J.—Allen Dale Hudlow was convicted of two counts of first degree rape, two counts of first degree kidnapping, and one count of second degree assault. In the same trial, Douglas B. Harper was convicted of one count of first degree rape and two counts of first degree kidnapping. In a separate proceeding, Hudlow was found to be a habitual criminal under the provisions of RCW 9.92.090. Both Hudlow and Harper appealed. The Court of Appeals, Division Two, held the trial court abused its discretion in excluding evidence of the two victims' prior sexual behavior and reversed the convictions. *State v. Hudlow,* 30 Wn. App. 503, 635 P.2d 1096 (1981). The State now appeals that decision. For the reasons stated herein, we reverse the Court of Appeals and reinstate the convictions.

The two complaining witnesses in this case were referred to by the Court of Appeals as Tammy Smith and Ellen Strong to protect their true identities. We shall do likewise. In a footnote, the court noted that "[a]t trial it developed the women were known locally as Sunshine and Moonshine." *Hudlow,* at 504 n.1. Apparently, the two women introduced themselves to Hudlow and Harper by these nicknames.

According to the two victims' testimony, when hitchhiking in Bremerton early on the morning of April 15, 1978, they accepted a ride from Hudlow and Harper. Hudlow allegedly threatened them with a knife and drove the two women to an isolated location outside Bremerton. There, Harper had sexual intercourse with Ms. Strong in the back seat of the car while Hudlow compelled Ms. Smith to perform oral sex on him in the front seat. Ms. Smith testified

that after a few seconds of performing oral–genital intercourse on Hudlow, she gagged and vomited outside the passenger door. Hudlow then made the women change places. Hudlow forced Ms. Strong to finish performing oral sex on him, then he had sexual intercourse with her. The women testified that during all the sexual activity, Hudlow was armed with a 6–inch knife and that they submitted to the sexual activity to prevent injury to themselves.

According to the testimony of Hudlow and Harper, the two women agreed to be driven to the isolated spot and, in fact, gave directions to that location. Both women allegedly agreed to consume some beer and a mixture consisting of cola and rum, and all four allegedly shared some marijuana cigarettes. Once there, Ms. Strong was said to have agreed to sexual intercourse with Harper in the back seat. At the same time, Ms. Smith refused to have sexual intercourse with Hudlow because she was menstruating, but allegedly offered to perform oral sex on Hudlow instead. When she did so, however, she began to gag but did not vomit. At this point, Ms. Strong suggested switching places with Ms. Smith. Ms. Strong then performed oral sex on Hudlow and thereafter had consensual sexual intercourse with him. Afterwards, Hudlow discovered that Ms. Strong had stolen his wallet, but he recovered it after an argument. Hudlow testified that during the sexual activity, he had with him only a small penknife which he did not remove from his pocket during the evening. No other knife was found by the police.

Hudlow and Harper drove the two women back to Bremerton where they were released. Shortly thereafter, the two women contacted the police who transported them to the hospital. Witnesses who saw Ms. Smith and Ms. Strong after the incident testified the women were extremely upset and frightened. A physician who examined Ms. Smith observed a mark on her abdomen similar to a bruise. The physician testified the mark was consistent with her claim of having been struck in the abdomen by Hudlow.

At a closed hearing outside the presence of the jury,

Hudlow and Harper made an offer of proof regarding the prior sexual behavior of Tammy Smith and Ellen Strong, pursuant to the procedures set out in former RCW 9.79-.150(3), now codified as RCW 9A.44.020(3). The offer of proof consisted of the testimony of a sailor named Harry Proctor, who shared a house with six other sailors in Bremerton. Proctor testified that he had engaged in oral sex with both women on a number of occasions, and had had sexual intercourse with Ms. Smith at least twice and with Ms. Strong more often, but not on a regular basis. He testified that he had been involved in and witnessed Smith and Strong having "group sex" with one or two men at a time. In addition, Proctor related several hearsay statements of other men who professed to have had sexual relations with the complaining witnesses. He also claimed Ellen Strong admitted to sexual intercourse with numerous other sailors. Proctor testified that he discussed the two women's respective skills at oral sex with his roommates and that together, they formed a rating system to evaluate their respective performances in oral–genital sex, rating Ms. Strong the better of the two. Proctor had been told that Ms. Strong, knowing of the rating system, tutored Ms. Smith in oral sex. Proctor also related a number of other hearsay statements about the past sexual behavior of the complaining witnesses. Proctor concluded by describing the reputation for chastity of Tammy Smith and Ellen Strong as "loose" and stated that he and his roommates simply referred to them as "the whores".

The trial court determined Proctor's testimony was relevant on the issue of consent, but ruled the probative value of the evidence was outweighed by its potentially prejudicial effect on the jury, the complaining witnesses, and the State. In making its ruling, the court considered the testimony of Proctor insofar as he testified from his own personal knowledge and did not consider any of the inadmissible hearsay testimony. The court concluded that the lifestyle of the women "would be so offensive to a substantial number of the members of the jury that the preju-

dice would get in the way of a fair trial". Report of Proceedings, at 40. The court therefore refused to permit introduction of the evidence either on direct or cross examination, although the trial judge later permitted limited cross examination on sexual matters when initiated by the prosecution. Subsequently, the jury returned verdicts of guilty on all counts.

The Court of Appeals characterized the dispositive issue in this case as whether the trial court abused its discretion under the "rape shield" statute when it determined the probative value of evidence of the victims' past sexual behavior was substantially outweighed by the danger of undue prejudice. The court thereby avoided the issue of whether respondents' rights of confrontation were violated under the sixth amendment to the United States Constitution and Const. art. 1, § 22.[1] We shall address both issues in regard to respondents' rights to present evidence in their defense and to confront and cross–examine adverse witnesses.

## I
### Direct Evidence Relating to Consent

This case is governed by the former "rape shield" statute, RCW 9.79.150(3) (now recodified as RCW 9A.44.020(3)), which provides in part:

> In any prosecution for the crime of rape . . . evidence of the victim's past sexual behavior . . . is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent only pursuant to the following procedure:
>
> (a) A written pretrial motion shall be made by the defendant to the court and prosecutor stating that the

---

[1]U.S. Const. amend. 6 provides, in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . ."

Const. art. 1, § 22 provides in part:

"In criminal prosecutions the accused shall have the right to . . . meet the witnesses against him face to face, [and] to have compulsory process to compel the attendance of witnesses in his own behalf . . ."

defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim proposed to be presented and its relevancy on the issue of the consent of the victim.

. . .

(c) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and the hearing shall be closed . . .

(d) At the conclusion of the hearing, if the court finds that the evidence proposed to be offered by the defendant regarding the past sexual behavior of the victim is relevant to the issue of the victim's consent; is not inadmissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice; and that its exclusion would result in denial of substantial justice to the defendant; the court shall make an order stating what evidence may be introduced by the defendant . . .

We have had occasion to construe the rape shield statute only once before in a case quite dissimilar in its facts. *See State v. Demos*, 94 Wn.2d 733, 619 P.2d 968 (1980) (evidence of prior rape complaints by rape victim not admissible where defendant was unable to prove the prior complaints were unfounded). The Washington courts of appeal have addressed the applicability of the statute on several occasions, and thus provide the only existing authority so far in this state.

Former RCW 9.79.150(3) makes evidence of the victim's past sexual behavior admissible on the issue of consent only if: (1) it is relevant; (2) its probative value substantially outweighs the probability that its admission will create a substantial danger of undue prejudice; and (3) its exclusion will result in denial of substantial justice to the defendant. Since all three factors must be satisfied before evidence of a victim's past sexual behavior may be admitted to show consent, we will examine each of those factors at some length.

A

RELEVANCE OF PRIOR SEXUAL CONDUCT

According to ER 401, relevant evidence is defined as fol-

lows:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Former RCW 9.79.150(2) begins by making evidence of the victim's past sexual behavior inadmissible on the issue of the victim's credibility. That provision goes on to state that such evidence is inadmissible to prove the victim's consent unless the procedures of former RCW 9.79.150(3) are followed.[2] At the very outset, then, credibility is ruled out altogether as the basis for introducing past sexual conduct and consent is made a suspect justification for the introduction of such evidence. At least one law review article has charged that Washington's rape shield law conflicts with common law rules of impeachment and cannot be squared with the accused's right of confrontation under the Sixth Amendment. Tanford & Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U. Pa. L. Rev. 544, 581 n.179, 582 n.180 (1980). The above characterization of Washington's rape shield statute is wrong for at least two reasons. First, the prohibition of sexual conduct evidence is directed at the use of such evidence for impeaching the victim's *general credibility* for truth and veracity. The old common law rule apparently recognized a woman's promiscuity somehow had an effect on her character and ability to relate the truth, whereas no such effect existed as to men:

> [S]uch evidence is inadmissible in any case for the purpose of impeaching the character of a male witness . . .

---

[2]Former RCW 9.79.150(2) provides:

"Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section, but when the perpetrator and the victim have engaged in sexual intercourse with each other in the past, and when the past behavior is material to the issue of consent, evidence concerning the past behavior between the perpetrator and the victim may be admissible on the issue of consent to the offense."

> It is a matter of common knowledge that the bad character of a man for chastity does not even in the remotest degree affect his character for truth, when based upon that alone, *while it does that of a woman.*

(Italics ours.) *State v. Sibley,* 131 Mo. 519, 531, 33 S.W. 167 (1895). Former RCW 9.79.150(2) appears to us to be directed at the misuse of prior sexual conduct evidence based on this antiquated and obviously illogical premise. *See also State v. Kalamarski,* 27 Wn. App. 787, 792 n.4, 620 P.2d 1017 (1980) (McInturff, J., dissenting). Second, the defendant is permitted, under former RCW 9.79.150(4), to cross-examine and impeach the victim's testimony on her past sexual behavior if the prosecution raises the issue of her past sexual behavior in its case in chief.[3] We shall specifically address the cross examination question in part II of this opinion.

The presumption of inadmissibility of prior sexual conduct evidence on the issue of consent is a recent trend,[4] reversing years of the opposite rule, and is based on the observation that such evidence is usually of little or no probative value in predicting the victim's consent to sexual conduct on the occasion in question. As stated in *State v. Geer,* 13 Wn. App. 71, 73-74, 533 P.2d 389 (1975):

> Such evidence [specific acts of sexual misconduct by the prosecutrix] has little or no relationship to either the ability of the prosecuting witness to tell the truth under oath or her alleged consent to the intercourse.

*See also State v. Cecotti,* 31 Wn. App. 179, 182, 639 P.2d 243 (1982); *State v. Blum,* 17 Wn. App. 37, 46, 561 P.2d 226 (1977); Comment, *Evidence—Admissibility of the Victim's*

---

[3]Former RCW 9.79.150(4) provides:

"Nothing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior, but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence."

[4]As of 1980, 45 states and the federal courts had adopted rape shield statutes of some kind. *See* Tanford & Bocchino, at 591-602.

*Past Sexual Behavior Under Washington's Rape Evidence Law—Wash. Rev. Code § 9.79.150 (1976),* 52 Wash. L. Rev. 1011, 1028–37 (1977).

The inquiry as to the relevancy of prior sexual behavior of the complaining witness must be whether, under ER 401, the woman's consent to sexual activity in the past, without more, makes it more probable or less probable that she consented to sexual activity on this occasion. In other words, does the mere fact of prior consensual sexual activity have any value in predicting whether a woman would consent again? We believe that, without more, such evidence does not even meet the bare relevancy test of ER 401.

The argument that past consent to sexual conduct is relevant assumes a woman's consent to have sex with one or more men makes her somehow more likely to consent to other men. As pointed out in Abraham P. Ordover's article, *Admissibility of Patterns of Similar Sexual Conduct: The Unlamented Death of Character for Chastity,* 63 Cornell L. Rev. 90, 98 (1977), this reasoning is based on the following faulty syllogism:

> Major Premise: Women who possess the character trait of unchastity consent more readily than chaste women to sexual intercourse.
> Minor Premise: The complainant's reputation establishes that she possesses the character trait of unchastity.
> Conclusion: The complainant's character trait of unchastity makes her consent more likely than if she lacked this trait.

(Footnote omitted.) Ordover points out the conclusion is invalid because the major premise is grounded in the moral judgment that women who engage in nonmarital intercourse are "immoral", and that such immoral women are more likely to consent to sexual intercourse on any given occasion. Once the woman's immoral character is established, the fact finder could infer consent not from specific behavioral patterns, but rather from the woman's membership in the class of women of unchaste character. Without

other factors tending to indicate the past consensual sexual activity is factually similar in some respects to the consensual sex act claimed by defendant, it should not be considered relevant.

Factual similarities between prior consensual sex acts and the questioned sex acts claimed by the defendant to be consensual would cause the evidence to meet the minimal relevancy test of ER 401. For instance, if a complaining witness frequently engages in sexual intercourse with men shortly after meeting them in bars, this would have some relevancy if the defendant claims she consented to sexual intercourse with him under similar circumstances. Such a particularized factual showing would demonstrate enough similarity between the past consensual sexual activity and defendant's claim of consent that it would have the necessary predictive value required by ER 401. Nevertheless, this evidence may be so slightly relevant in comparison to its prejudicial effect that it may not be admitted into evidence. Former RCW 9.79.150(3); ER 403. It has been suggested that other factual situations may exist in which past sexual conduct may be relevant, such as: (1) evidence of prior sexual conduct by complainant with defendant; (2) to rebut medical evidence on proof of origin of semen, venereal disease or pregnancy; (3) distinctive sexual patterns so closely resembling defendant's version of the alleged encounter as to tend to prove consent on the questioned occasion; (4) evidence of prior sexual conduct by complainant with others, known to the defendant, tending to prove he believed the complainant was consenting to his sexual advances; (5) evidence of sexual conduct tending to prove complainant's motive to fabricate the charge; (6) evidence tending to rebut proof by the prosecution regarding the complainant's past sexual conduct; and (7) evidence of sexual conduct offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the acts charged. Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum. L. Rev. 1, 98–99 (1977). Other commentators have made similar suggestions

and the rape shield statutes in many states reflect these or other circumstances which may cause past sexual conduct evidence to be relevant and perhaps admissible. *See* Tanford & Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U. Pa. L. Rev. 544, 591–602 (1980).

Once other circumstances are identified which make the prior consensual sexual activity factually closer to the defendant's version of the story and the evidence is deemed relevant, the probative value must be balanced against the potentially prejudicial effect.

## B
### PROBATIVE VALUE VERSUS PREJUDICE

Former RCW 9.79.150(3) calls for a balancing process whereby the probative value of the evidence must substantially outweigh the probability that its admission will create a substantial danger of undue prejudice. This standard is roughly the equivalent of the standard stated in ER 403.[5] The Court of Appeals in the present case determined that the trial court erred in considering the possible adverse effects of the evidence on the victims rather than limiting consideration to the effect such evidence would have on respondents' rights to fair trials. *State v. Hudlow,* 30 Wn. App. 503, 509–10, 635 P.2d 1096 (1981). In so doing, the court quoted with approval from Tanford & Bocchino, at 569–70:

> Traditional evidence law recognizes that otherwise relevant evidence may be inadmissible because it would have the effect of disrupting the trial or sidetracking the search for truth. . . .
> The ground most frequently put forth in support of a blanket rule excluding sexual history evidence is . . . that such evidence is "prejudicial" and that this effect outweighs its slight probative value. The issue is not

---

[5]ER 403 reads as follows:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

whether evidence is prejudicial in the sense that it is detrimental to someone involved in the trial. *Rather, the question is whether the evidence will arouse the jury's emotions of prejudice, hostility, or sympathy. Arguments that sexual history evidence is inadmissible because of its prejudicial impact on the rape victim miss the point. Adverse psychological effects suffered by crime victims, although regrettable, are not grounds for excluding probative evidence.*

(Italics ours.) *Hudlow,* at 509.

In *State v. Kalamarski,* 27 Wn. App. 787, 789, 620 P.2d 1017 (1980), Division Three of the Court of Appeals held the prejudice referred to in the rape shield statute may be "either to the victim or the defendant." Division Three of the Court of Appeals recently followed the *Kalamarski* court's interpretation of prejudice as pertaining either to the victim or the defendant. *State v. Mounsey,* 31 Wn. App. 511, 521, 643 P.2d 892 (1982). Previously, Division Two of the Court of Appeals referred to "the danger of injecting undue prejudice against the prosecuting witness". *State v. Williams,* 18 Wn. App. 398, 405, 569 P.2d 1190 (1977). In the present case, the Court of Appeals cited to the above references in *Kalamarski* and *Williams,* but found neither case presented the issue in the same context as this case so it believed its decision did not conflict with either opinion. *Hudlow,* at 509 n.2.

We agree with the Court of Appeals in this case that the balancing process should focus not on potential prejudice and embarrassment to the complaining witnesses, but instead should look to potential prejudice to the truthfinding process itself. Rape shield statutes such as the one before us are, by their very nature, intended to minimize the embarrassment and humiliation to the prosecuting witness by limiting the introduction of evidence of prior sexual behavior. Thus, considerations of prejudice to the victim are built into the rape shield statute and further consideration of that factor may go too far in protecting the victim at the expense of defendant's right to a fair trial. The prejudice to the factfinding process itself must be considered to

determine whether the introduction of the victim's past sexual conduct may confuse the issues, mislead the jury, or cause the jury to decide the case on an improper or emotional basis. In addition to legitimate state concerns in preserving the integrity of the truthfinding process, the statute requires the trial judge to consider the effect of excluding such evidence on defendant's right to a fair trial. Former RCW 9.79.150(3)(d). These considerations—the integrity of the truthfinding process and defendant's right to a fair trial—should be the factors considered by the trial court in exercising its discretion to admit or exclude the evidence. Further consideration of the impact of past sexual behavior evidence on the complaining witness, as in *Kalamarski* and *Williams,* should no longer be the standard for balancing the probative value of such evidence against its possibly prejudicial effect.

## C
### DEFENDANT'S RIGHT TO SUBSTANTIAL JUSTICE

The Court of Appeals in the present case noted its belief that the trial court gave too much weight to the prejudicial effect of the evidence on the jury and too little consideration to the respondents' rights to fair trials. The court specifically noted that respondents' testimony that two women whom they had never before met had agreed to engage in sexual intercourse with them was highly implausible, absent the evidence the two women were highly promiscuous. The court concluded by stating the "[t]rial court's ruling simply eviscerated the defense". *Hudlow,* at 511. The trial court was reversed for abuse of discretion in not admitting evidence of the victims' past sexual behavior, but the court also recognized that a contrary ruling could conflict with respondents' rights of confrontation and compulsory process. *Hudlow,* at 506–07.

The sixth amendment to the United States Constitution and Const. art. 1, § 22 grant criminal defendants two separate rights: (1) the right to present testimony in one's defense, *Washington v. Texas,* 388 U.S. 14, 23, 18 L. Ed. 2d

1019, 87 S. Ct. 1920 (1967); and (2) the right to confront and cross–examine adverse witnesses, *Davis v. Alaska,* 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974); *Chambers v. Mississippi,* 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). *See also State v. Boast,* 87 Wn.2d 447, 453, 553 P.2d 1322 (1976). Of course, a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense. *Washington v. Texas, supra* at 16. *See generally* E. Cleary, *McCormick on Evidence* § 185 (2d ed. 1972 & Supp. 1978). Former RCW 9.79.150(2) and (3) are directed to the right of a defendant to present relevant evidence in his defense; former RCW 9.79.150(4) is directed to the confrontation and cross examination guaranties.

 Like any constitutional right, these rights have limits. Although the defendant has the right to put on relevant evidence, this right may be counterbalanced by the state's interest in seeing that the evidence is not so prejudicial as to disrupt the fairness of the factfinding process. This balancing process has been suggested in the cases of *Davis* and *Chambers* as permissible, but the importance of the state interest necessary to exclude the evidence has not been fully defined. Tanford & Bocchino, at 556 *et seq.* suggest the state must demonstrate a compelling state interest to exclude a defendant's relevant evidence. Recently, the Michigan Court of Appeals followed this rationale in holding a defendant had the right to impeach the credibility of an adverse witness with eight felony convictions ranging from 13 to 40 years old despite Michigan's version of ER 609(b), which limits such evidence to 10–year–old convictions:

> *[I]t is clear that any attempt to limit meaningful cross– examination, whether it be by legislative act, judicial pronouncement or court ruling upon the admissibility of evidence, court rule, or the common law, must be justified by a compelling state interest.* Where a statute or court ruling is challenged on grounds that it unduly restricts the Sixth Amendment right to confrontation, the state's interest in the rule must be balanced against the fundamental requirements of the constitution. *Davis*

*v Alaska, supra, People v Kahn,* 80 Mich App 605, 612; 264 NW2d 360 (1978).

(Italics ours.) *People v. Redmon,* 112 Mich. App. 246, 255, 315 N.W.2d 909 (1982). We believe the "compelling state interest" requirement is the proper method of balancing the defendant's right to produce relevant evidence versus the state's interest in limiting the prejudicial effects of that evidence. We now adopt that standard as our own.

In the case at bar, if the evidence of prior sexual history of the complaining witnesses is not relevant under ER 401 standards, there is no problem under the Sixth Amendment or Const. art. 1, § 22. If the evidence is of minimal relevancy, the evidence may be excluded if the State's interest in applying the rape shield law is compelling in nature. Here, the State's interest in applying the rape shield statute is to bar evidence that may distract and inflame jurors if it is of arguable probative worth. To the degree exclusion of prior sexual history evidence aids in achieving just trials and preventing acquittals based on prejudice against the victims' past sex lives, it tends to further the truth–determining function of criminal trials. Further, the statute is designed to encourage rape victims to step forward and prosecute these crimes where conviction rates historically have been very low. The above state interests appear to us to be compelling enough to permit the trial court to exclude minimally relevant prior sexual history evidence if the introduction of such evidence would prejudice the truth-finding function of the trial. As to evidence of high probative value, however, it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22. *See Davis v. Alaska, supra; Chambers v. Mississippi, supra; People v. Redmon, supra.*

### D
### APPLICATION OF THE RAPE SHIELD STATUTE

As previously pointed out, evidence of the victim's past sexual behavior is admissible under former RCW 9.79-

.150(3) on the issue of consent only if: (1) it is relevant; (2) its probative value substantially outweighs the probability that its admission will create a substantial danger of undue prejudice; and (3) its exclusion will result in denial of substantial justice to the defendant.

In determining the relevancy of the victims' prior sexual behavior on the issue of consent, it must be demonstrated that the evidence will make it more probable or less probable that they consented to sexual activity on this occasion. The evidence proffered by the defense concerned only the general promiscuity of the two victims and lacked further indicators showing any past consensual sexual activity comparable to the story offered by respondents Hudlow and Harper. Mr. Proctor's testimony failed to show any factual similarities between the incident forming the basis of the present charges and any of the past sexual activity allegedly consented to by Ms. Smith or Ms. Strong. For instance, no testimony was offered showing that the two women had ever engaged in sex with men other than sailors whom they knew or that they had sexual relations with men who had picked them up hitchhiking. Such evidence would have had greater value in aiding the jury to predict whether consent was given in this case. Without such particularized factors, however, the relevancy of the evidence was limited at best.

Further, the testimony of Mr. Proctor was full of inadmissible hearsay evidence in which he related unverifiable incidents of sexual activity involving the two victims. The trial court heard all the testimony, but properly considered only the evidence testified to by Mr. Proctor from his personal knowledge. Those limited instances do not establish such a pattern of indiscriminate consent to sexual activity as to be helpful in predicting whether there was consent in this case. We believe the testimony of Mr. Proctor was of little or no probative worth on the issue of consent in this case.

The admissibility of past sexual behavior evidence is within the sound discretion of the trial court. *State v.*

*Blum*, 17 Wn. App. 37, 46, 561 P.2d 226 (1977). The exercise of discretion in balancing the danger of prejudice against the probative value of the evidence is also a matter within the trial court's discretion, and should be overturned only if no reasonable person could take the view adopted by the trial court. *State v. Kalamarski*, 27 Wn. App. 787, 789, 620 P.2d 1017 (1980); *State v. Blum, supra* at 56. We are unable to say the trial court abused its discretion in any way.

Although the trial court did consider the possible prejudice to the victims in admitting evidence of their past sexual behavior, it is evident the court gave little weight to that factor. In ruling that the evidence should be excluded, the court concluded that the lifestyle of the women "would be so offensive to a substantial number of the members of the jury that the prejudice would get in the way of a fair trial". Report of Proceedings, at 40. The trial court's ruling demonstrates its valid concern that introduction of such evidence would tend to confuse the issues, mislead the jury, or cause them to decide the case on an improper basis. *See* ER 403. The court's determination that the slight relevancy of the evidence was outweighed by its potentially prejudicial effect on the jury was proper under the circumstances and should not be disturbed.

Finally, as to respondents' rights to substantial justice, we must again conclude the trial court's ruling was proper. Assuming that the past sexual behavior evidence was even slightly relevant, that evidence could constitutionally be excluded because of the compelling state interests furthered by the rape shield statute. Insofar as the rape shield law bars minimally probative evidence that may distract or inflame jurors to acquit defendants on the basis of prejudice, furthers the truth–determining function of rape trials, and encourages victims to report and prosecute sex crimes, it furthers compelling state interests. The trial court's decision to exclude the evidence did not deprive respondents of the ability to testify to their versions of the incident. They did so and simply were not believed by the jury.

In conclusion, we believe the trial court properly applied former RCW 9.79.150 to exclude evidence of the victims' past sexual behavior. Although the Court of Appeals stated its belief that this was the one "exceptional case" warranting admission of this type of evidence, *State v. Hudlow*, 30 Wn. App. 503, 507, 635 P.2d 1096 (1981), we are of a contrary view given the nature of the evidence in this case. On this issue, we must reverse the Court of Appeals and reinstate the decision of the trial court.

## II
### Cross Examination To Impeach Testimony
### of Prosecuting Witnesses

Respondents Hudlow and Harper next contend the trial court's ruling denied them the ability to effectively cross-examine and impeach the prosecuting witnesses in regard to their testimony about the actual rape incident. Specifically, they allege the prosecution introduced evidence of the victims' past sexual behavior in its case in chief and that they should have been permitted to cross-examine the victims as to their past sexual behavior under former RCW 9.79.150(4), which reads:

> (4) Nothing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior *when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior,* but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence.

(Italics ours.) Respondents refer to two specific instances of testimony elicited by the prosecution from Tammy Smith as the grounds for their argument.

As to the first instance, the prosecutor asked Ms. Smith what respondent Hudlow said to her just before he forced her to perform oral-genital sex on him:

> Q: What did he say to you? A: He told me to play with myself. Q: And did you, you know, know what he meant by that? A: Yeah. Q: What did you tell him? A: I told him I didn't know how. Q: And what did he say in regard

to that response? A: He told me, "It's about time you learned." Q: Then what happened? A: *Then he told me that I had to give him a blow job. Q: Did you know what he meant by that? A: Yeah. . . . Q: What did you do when he asked you to give him a blow job? A: I told him I didn't know how.* Q: What was his response? A: He just said he was going to—that I had to do it anyways.

(Italics ours.) Supplemental Verbatim Report of Proceedings, at 152–53. The only additional direct testimony as to knowledge occurred during Ms. Smith's testimony of what happened to Ms. Strong:

A: He made her . . . he made her do . . . he made her give . . . he made her give him a blow job. Q: *When you say, "give him a blow job", what do you mean, what does that terminology mean? A: He—you mean—it means oral sex.*

(Italics ours.) Supplemental Verbatim Report of Proceedings, at 158.

Ms. Smith's direct testimony was to the effect that she told Hudlow that she did not know how to give a "blow job", but at the same time, she testified that she actually did know what the term meant. The defense counsel stated he wanted Ms. Smith to explain this "disparity" on cross examination. The relevant portion of that cross examination is as follows:

Q: Miss [Smith], do you remember, on direct testimony, testifying that you were told that you had to give the driver a blow job? A: Yes. Q: Do you remember what your reply was to that? A: Yes. Q: Was it that you didn't know how? A: No. Q: Do you recall so being asked if you knew what that meant, do you remember being asked that by Mr. Sharpe? A: Yes. Q: Do you remember what your reply was to that question? A: No. Q: Did you reply yes? A: I didn't hear what you said. Q: Was your reply yes to Mr. Sharpe? A: No, before that? Q: I said, do you remember what your reply was? A: To what I said to him? Q: Yes. A: Oh. Yes. Q: *How do you know what it means to give a blow job? A: (No response) Q: Can you answer that question? A: It means . . . Q: The question is how do you know what it means. A: How do I know what it means? Q: Yes. A: Because we talked about it at*

*school.* Q: *By "We", who do you mean?* A: *We girls, us girls.* Q: What does it mean to you? A: (No response) Q: *Does it mean placing your mouth on the penis of a male?* A: *Yes.* Q: *That is what you talked about with the girls at school?* A: *Yes.*

(Italics ours.) Supplemental Verbatim Report of Proceedings, at 237–38.

Our first inquiry must be whether, under former RCW 9.79.150(4), the prosecution presented evidence in its case in chief tending to prove Ms. Smith's past sexual behavior. We think not. The prosecution's line of direct examination was not an inquiry into whether Ms. Smith did or did not know what the term "blow job" meant from personal experience. Simply stated, the question was whether she understood the meaning of Hudlow's words. She answered that she did. After the question was asked and answered, further inquiry into the source of her knowledge was unnecessary.

Neither was Ms. Smith's statement that she told Hudlow she did not know how to give a blow job an attempt to prove Ms. Smith's past sexual behavior. Obviously, she told Hudlow that she did not know how to perform oral sex as an evasive maneuver to escape having to perform the act. We do not think such testimony was intended or interpreted to convey ideas of Ms. Smith's sexual virtuousness.

▪ The most obvious infirmity with respondents' argument is that the defense, and not the prosecution, is opening up the area of Ms. Smith's previous sexual experience by asking how she knows what a blow job means. Former RCW 9.79.150(4) permits the defense to attack credibility when the prosecution opens the door to past sexual behavior. That did not occur here. Thus, the statute affords respondents no right to cross-examine her on the source of her knowledge. Further, even if the defense had been successful in eliciting information about whether Ms. Smith did or did not have prior personal experience at oral sex, it simply was not relevant to the credibility of her statement on direct examination. If she had personal experience as

well as spoken knowledge of the term, her statements on direct examination would not be contradicted. Since the scope of such cross examination is within the discretion of the trial court and is to be disturbed only upon abuse of discretion, *State v. Krausse*, 10 Wn. App. 574, 577, 519 P.2d 266 (1974), we find no error because we find no abuse of discretion.

The second portion of testimony pointed to by respondents relates to Ms. Smith's testimony that she became sick and vomited as a result of forced oral sex. She made these statements on direct examination and repeated the testimony on cross examination. This evidence, like the previously discussed testimony, does not tend to prove Ms. Smith's prior sexual behavior. Her testimony did not explain that she vomited because it was the first time she had performed oral sex. Such testimony would open up her past experience to cross examination. Ms. Smith's simple statement that she vomited after being forced to perform oral sex at knifepoint had nothing to do with her past experience or familiarity with performing oral sex with other men. Again, the trial court's decision to limit cross examination in this area was discretionary and will not be disturbed. *See State v. Krausse, supra.*

### III
### HUDLOW'S HABITUAL CRIMINAL STATUS

Under RAP 13.7(b), when this court accepts a petition for review we "will review only the questions raised in . . . the petition for review and the answer". In the present case, respondent Hudlow properly raised issues at the Court of Appeals pertaining to the validity of the habitual criminal proceedings instituted against him. Specifically, he challenged the use of certain prior convictions under the rationale of *State v. Holsworth*, 93 Wn.2d 148, 607 P.2d 845 (1980). The Court of Appeals, however, did not reach the issue because it reversed the trial court on another ground and vacated respondents' convictions. When the petition

for review was accepted here, respondent Hudlow did not raise the issue in response to the petition for review and did not orally argue the issue before us.

██ Since respondent Hudlow properly preserved the issue of his habitual criminal status for appeal, we believe that issue deserves appellate court consideration. In *Courtright Cattle Co. v. Dolsen Co.*, 94 Wn.2d 645, 658–59, 619 P.2d 344 (1980), we remanded an issue not before considered by the Court of Appeals back to that court for its determination so as to completely dispose of the controversy. We believe that procedure is proper in the case before us and now remand the issue of respondent Hudlow's habitual criminal status to Division Two of the Court of Appeals for its decision.

We reverse the Court of Appeals and reinstate the convictions of respondents Hudlow and Harper. With respect to respondent Hudlow's challenge to the habitual criminal proceedings instituted against him, we remand the matter to the Court of Appeals, Division Two, for its resolution of that issue.

Reversed and remanded.

ROSELLINI, STAFFORD, BRACHTENBACH, DORE, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J. (dissenting)—I concur fully in the majority's interpretation and analysis of the rape shield statute, RCW 9A.44.020. I dissent, however, because I believe the majority misapplies the statute in this case, inasmuch as the prosecution "opened the door". The defendants were therefore entitled to cross–examine the complaining witnesses about their prior sexual conduct.

As the majority recognizes, the statute requires a delicate balancing of society's interest in preventing a heinous crime and the defendants' constitutional right to a fair trial. The interest in rape prevention lies not only in its nature as a violent crime grossly invasive of privacy but also in its

identification with our previous relegation of women to second-class status. *See* Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom,* 77 Colum. L. Rev. 1, 2–3, 10–12 (1977). The defendant's Sixth Amendment rights to confront his accusers and call witnesses in his behalf, on the other hand, are "basic in our system of jurisprudence". *Chambers v. Mississippi,* 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973) (quoting *In re Oliver,* 333 U.S. 257, 273, 92 L. Ed. 682, 68 S. Ct. 499 (1948)). These rights are especially crucial in a rape case where, more often than in other cases, the testimony of the victim is critical in establishing guilt or innocence.

In order to protect defendants' Sixth Amendment rights, RCW 9A.44.020(4) (formerly RCW 9.79.150(4)) provides that a defendant may present evidence of past sexual behavior whenever "the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior". RCW 9A.44.020(4). This incorporates perhaps the most basic aspect of the aforementioned Sixth Amendment rights—the right to rebut evidence affirmatively presented by the State. On the other hand, this provision does little to prejudice the State's interest, since the prosecution can entirely avoid the issue by not presenting such evidence.

It is RCW 9A.44.020(4) which the majority improperly applies in the present case. One of the complaining witnesses, Ms. Tammy Smith, testified as follows:

Q What did you do when he [defendant Hudlow] asked you to give him a blow job?
A I told him *I didn't know how.*

(Italics mine.) Supplemental Verbatim Report of Proceedings, at 152–53. This testimony, as does most evidence, tends to prove several facts. First, it is evidence of what Hudlow was told, which is relevant to show that Ms. Smith sought to evade performing oral sex with him. It also is hearsay evidence, however, that Ms. Smith does not know how to perform oral sex. This tends to prove that she has

not done so in the past.[6] Thus this testimony "tend[ed] to prove the nature of the victim's past sexual behavior"; namely, that she has never before performed oral sex.

Whether Ms. Smith intended such meaning is irrelevant—the question is whether the jury could have so interpreted her testimony. While the majority finds Ms. Smith's meaning "obvious" (majority, at 21), I do not, especially when reading the above quoted testimony in its broader context.

Q What did he say to you?
A He told me to play with myself.
Q And did you, you know, know what he meant by that?
A Yeah.
Q What did you tell him?
A I told him I didn't know how.
Q And what did he say in regard to that response?
A He told me, "It's about time you learned."
Q Then what happened?
A Then he told me that I had to give him a blow job.
Q Did you know what he meant by that?
A Yeah.
. . .
Q What did you do when he asked you to give him a blow job?
A I told him I didn't know how.

Supplemental Verbatim Report of Proceedings, at 152–53. The jury might well have formed the construct, "I know what he meant, but not how to do it", from this testimony. The prosecution's evidence did, therefore, "tend to prove the nature of the victim's past sexual behavior" and thus "opened the door".[7]

---

[6]While the fact that a person knows how to perform an act does not conclusively prove she has done so, the fact that she does not know how to perform an act does tend to prove she has not done so.

[7]Moreover, the hearsay nature of the evidence introduced by the prosecution does not "close the door". The door may be opened by inadmissible as well as admissible evidence. *See, e.g., State v. Odell,* 38 Wn.2d 4, 13–14, 227 P.2d 710 (1951) (hearsay reference to prior conviction by defendant's psychiatrist opened door to further inquiry into conviction); *State v. Wilson,* 26 Wn.2d 468, 484–85, 174 P.2d 553 (1946) (testimony regarding facts underlying prior conviction opened

Still, the scope of the rebuttal evidence to which the door was opened was narrow. In an instance such as this where the witness' testimony can be given several meanings, I believe RCW 9A.44.020(4) first requires that the defendant attempt to clarify its meaning. Only if, after clarification, the testimony still tends to prove past sexual conduct is further cross examination in that area permissible.

In this case, therefore, defendants were required to first clarify whether Ms. Smith intended to claim that she had actually never before performed oral sex. In essence, this is what the defendants did, though somewhat inartfully.

Q. Do you know what he meant from personal experience?
A. No.
Q. So it is just from conversations you have had with other people about that?
A. Yeah.

Supplemental Verbatim Report of Proceedings, at 208. Moreover, the court gave express prior approval of this line of questioning outside the presence of the jury. Supplemental Verbatim Report of Proceedings, at 205–06.[8]

Had Ms. Smith conceded in response to this questioning that she had had prior experience with oral sex, RCW 9A.44.020(4) would not have permitted further cross examination in the area for there would be no damaging evidence to rebut. Instead, however, her denial confirmed what her prior testimony implied. At that point, defendant should have been allowed complete cross examination in the area of Ms. Smith's prior experience with oral sex. The court's refusal to allow such cross examination was error.

---

door to cross examination on same matter); *State v. Howard,* 137 Wash. 172, 172, 242 P. 21 (1926) (same, though "the testimony might not have been originally material").

[8]A more appropriate approach would have been to ask: "When you testified that you told Mr. Hudlow you didn't know how to give a blow job, did you mean to imply that you actually didn't know or only that you told him that to avoid having to do it?" This was the gist of defendant's questioning, however, and, especially in light of the trial court's prior approval, I believe it sufficient.

The defendants were improperly denied their statutory rights of cross examination and their constitutional rights to confront their accusers. I dissent.

DOLLIVER, J., concurs with UTTER, J.