**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 81667-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| MARIO ANTHONY DIGIOIA, JR, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |
| | ) | |

MANN, C.J. — Mario Digioia appeals his judgment and sentence for one count of second degree assault of a child. Digioia argues that the trial court deprived him of the right to present a defense, the trial court deprived him of the right to confrontation, and the prosecutor committed misconduct, depriving him of the right to a fair trial. We affirm.

<u>FACTS</u>

On January 10, 2019, Digioia brought eight-week-old H.D. into the emergency room (ER). H.D. had a bruise and swelling to her right shoulder, including obvious pain upon movement. Doctor Sara Ahmed examined H.D. and spoke to Digioia. Digioia stated he noticed the injury two days prior and that there was no trauma to the area. Dr.

Citations and pin cites are based on the Westlaw online version of the cited material.

Ahmed completed a full-body examination and ordered x-rays for the area. Dr. Ahmed noted H.D. had a bruise over her right clavicle and symmetrical bruises on each side of her jaw, halfway between her ear and her chin. Dr. Ahmed was concerned of child abuse because babies at eight weeks are not mobile and the bruises on the jaw were in a position consistent with someone placing their hand over H.D.'s face.

The x-rays revealed a complete right clavicle fracture. The bone was broken in the middle with the ends apart and overlapping. Dr. Ahmed posited the fracture was relatively recent. Notably, on January 6, 2019, H.D. was in the ER and diagnosed with Respiratory Syncytial Virus, a common child respiratory infection. Chest x-rays taken then did not show an existing fracture. To hold infants still during x-ray, medical staff use a cylindrical device called a Pigg-O-Stat to prevent movement.

In accordance with national child abuse guidelines, H.D. was admitted to the hospital and underwent a full body scan (bone survey) and complete blood workup. The bone survey revealed chip or corner fractures at the ends of the femoral and tibial bones on both of H.D.'s legs above and below her knees. Dr. Ahmed testified that hard squeezing or yanking and twisting of the leg typically generates these types of fractures.

The blood workup revealed that H.D. was not anemic and that her calcium level was normal and indicative of normal bone development. Dr. Ahmed testified that H.D.'s bones were appropriately formed and calcified. H.D. had a low vitamin D level and a correspondingly high parathyroid level. Vitamin D deficiency, and a correspondingly high parathyroid level, is normal in newborns because breast milk does not contain vitamin D. Dr. Ahmed testified that vitamin D deficiency can develop into bone diseases, but only in extreme cases of poverty and malnutrition, and that it would take

six to eight months for this to occur. Dr. Ahmed also ruled out Rickets or Ehlers-Danlos syndrome.

Doctor Michael Long, a pediatric emergency medicine physician at Mary Bridge, also completed a full medical assessment of H.D. Dr. Long underwent child abuse training during residency and is a board certified general pediatrics and pediatric emergency medicine doctor. Dr. Long's diagnosis was consistent with Dr. Ahmed's diagnosis of bruising, a clavicle fracture, and femoral and tibia fractures consistent with child abuse. He opined that, because infant bones are quite soft and flexible, it is rare to see unexplained fractures in infants where considerable force would be necessary for such results. He additionally concluded that the routine handling of newborns would not cause H.D.'s fractures and that the x-rays did not show any bone disease or abnormalities.

Doctor Jeffrey Blake, a pediatric emergency medicine physician at Mary Bridge, examined H.D. on January 6, 2019, when she was brought in for a runny nose and cough. At the visit, Dr. Blake ordered a chest x-ray because of H.D.'s age. Dr. Blake testified that if there were any abnormalities or diseases affecting H.D.'s bones, he and the radiologist would have seen it.

Doctor Nathan Frost, a pediatric orthopedic surgeon at Mary Bridge, also evaluated H.D. on January 10, 2019. Dr. Frost is a board certified orthopedic surgeon with great knowledge of bone disorders and children with musculoskeletal issues. Dr. Frost testified that the clavicle was fractured with force applied to the area and the leg fractures are indicative of child abuse. He also testified that the fractures could not

have been caused by routine care and that it is not generally accepted that low vitamin D would cause such fractures.

Doctor Jana Fahmy, a pediatric radiologist at Mary Bridge, examined H.D. on January 10. Dr. Fahmy completed a fellowship in child radiology and is a board certified radiologist. Part of her training consisted of detecting the difference between normal and abnormal bones. Dr. Fahmy testified that H.D.'s bones were perfectly normal with no signs of abnormal bone disease or rickets. Dr. Fahmy has been examining infant bone x-rays for 27 years.

Follow-up x-rays were taken 15 days later. The new x-rays revealed a rib fracture, however due to evidence of healing at all fracture sites, it appeared that all the fractures occurred on a similar date.

The State charged Digioia with assault of a child in the second degree. Digioia did not testify at trial but did present an expert witness, Doctor Marvin Miller. Dr. Miller is a professor of pediatrics at Wright State University. Dr. Miller opined that the doctors H.D. saw were incorrect, that H.D. did not have leg fractures but merely poorly mineralized bones. Dr. Miller testified that H.D. suffered from metabolic bone disease in infancy, and that the fractures resulted from routine handling by the parents. On cross-examination, Dr. Miller explained that he coined the term metabolic bone disease in infancy and wrote an article about it in 2019. The American Academy of Pediatricians Committee on Child Abuse and Neglect submitted a response disagreeing with his article. Metabolic bone disease is not a generally accepted theory and is not accepted at Mary Bridge or the American Academy of Pediatrics.

The State called Dr. Elizabeth Woods as a rebuttal witness. Dr. Woods was a child abuse consultant and was the medical director of the Child Abuse Intervention Department at Mary Bridge. Dr. Woods worked in child abuse at two hospitals previous to Mary Bridge. Dr. Woods testified that she received specialized training in child abuse throughout her medical schooling, pediatric residency, and through her continuing medical education.

On January 11, 2019, Dr. Woods received a consult request for H.D. Dr. Woods reviewed all medical records and completed a head to toe examination. Dr. Woods arrived at a conclusion consistent with the other doctors that examined H.D. Dr. Woods testified, like the other doctors, that metabolic bone disease in infancy is not a diagnosis recognized at Mary Bridge.

At trial, Digioia sought to question Dr. Woods about another trial judge's decision in an unrelated dependency case in which Dr. Woods testified. Digioia claimed the decision was relevant to the jury's determination of Dr. Woods's credibility and qualifications as an expert. The State objected, stating the case was factually different and the judge's decision was inadmissible opinion. The State provided an unfavorable case involving Dr. Miller's expert testimony and opined it was equally inadmissible. The trial court held that impeachment through opinions from other courts was improper. The court stated the alternate case contained dissimilar facts that would confuse the jury and it would likely be given undue and inappropriate weight. The court extended this ruling to any related news story.

Digioia moved for reconsideration, claiming the decision violated the confrontation clause and his right to put on a defense. The trial court declined to

reverse the ruling.  The court explained that an attempt to impeach Dr. Woods was not critical to the defense because the idea that metabolic bone disease in infancy is not supported was a collective opinion.

During the State's closing argument, defense counsel objected to the prosecutor's definition of intentional conduct.  The trial court noted the objection and reminded the jury that "what the attorneys say is not law and is not evidence."

The jury found Digioia guilty of second degree and third degree assault of a child. The State dismissed the third degree assault conviction on double jeopardy grounds. The State agreed that Digioia should receive an exceptional sentence below the standard range of 31 to 41 months.  Digioia received a sentence of six months confinement.  Digioia appeals.

## ANALYSIS

### A. Right to Present a Defense

Digioia asserts that his right to present a defense was violated when the trial court ruled he could not use a trial court opinion and news story in an unrelated dependency action to impeach Dr. Woods.  We disagree.

The Sixth Amendment to the United States Constitution and Washington Constitution article I, section 22 grants criminal defendants the right to present testimony in one's defense.  State v. Hudlow, 99 Wn.2d 1, 15-16, 659 P.2d 514 (1983). On appeal, the court reviews a violation of the right to present a defense de novo, but it reviews specific evidentiary rulings for abuse of discretion.  State v. Clark, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017); State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).  We engage in a two-step review process to review the trial court's individual

-6-

evidentiary rulings for an abuse of discretion and consider de novo the constitutional question of whether these rulings deprived the defendant of his Sixth Amendment right to present a defense. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019).

The trial court must provide the accused with "a fair opportunity" to defend against the government's accusations. Jones, 168 Wn.2d at 719. This right is satisfied through meaningful cross-examination. State v. Darden, 145 Wn.2d 612, 620-21, 41 P.2d 1189 (2002). However, these rights are not absolute. "The accused does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." State v. Lizarraga, 191 Wn. App. 530, 533, 364 P.3d 810 (2015). The right to present a defense is limited by the general rules of evidence. Darden, 145 Wn.2d at 621.

Conversely, "the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted." Arndt, 194 Wn.2d at 797-98. In some instances of evidence of high probative value, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1 § 22." Hudlow, 99 Wn.2d at 16.

First, we examine whether the trial court abused its discretion in preventing Digioia from impeaching Dr. Woods with another court opinion and related news story. Digioia presents no argument that the use of another judicial opinion and news story fits within the rules of evidence. Generally, a witness cannot be impeached on matters collateral to the principal issues being tried. State v. Oswalt, 62 Wn.2d 118, 120, 381 P.2d 617 (1963). The decision to exclude testimony is a gatekeeping function within the sound discretion of the trial court. Arndt, 194 Wn.2d at 812. The trial judge determined

the unrelated judicial opinion and related news story were collateral issues not imperative to the trial at hand. Additionally, if Digioia intended to use a factually unrelated case to impeach Dr. Woods's credibility, the State would ensue with the same rhetoric against Dr. Miller. The trial judge found this line of evidence and questioning confusing to the jury and thus inadmissible. We decline to overturn the reasoned discretion of the trial court.

Second, we must examine whether the reasoned exclusion of this impeachment evidence resulted in a violation of Digioia's right to present a defense. In Arndt, the trial court limited the testimony of the defendant's expert witness. 194 Wn.2d at 812. The defendant raised a "right to present a defense" claim. Arndt, 194 Wn.2d at 812. The Supreme Court upheld the trial court's ruling and noted the trial court has a gatekeeping function under the rules of evidence. Arndt, 194 Wn.2d at 812. Because the defendant was able to advance their defense theory, and the exclusion of evidence did not eliminate the defendant's entire defense, the exclusion of such evidence did not violate the defendant's Sixth Amendment right to present a defense. Arndt, 194 Wn.2d at 814.

This case is similar. While Digioia's inability to impeach Dr. Woods with a judicial opinion where the judge disagreed with her testimony, and related news story, degrades the strength of Dr. Miller's expert testimony, it is not the entire defense. Dr. Woods's and Dr. Miller's theories are at odds, but the exclusion of Dr. Woods's testimony does not remove this friction. All of the Mary Bridge doctors that testified and examined H.D. were in consensus. It was the doctors' collective opinion that metabolic bone disease in infancy is an unsupported theory, H.D.'s bones appeared healthy and free of disease, and the bruising and fractures were not consistent with normal handling of a child.

Thus, the exclusion of testimony aimed at impeaching Dr. Woods was not critical to the defense, and did not result in a violation of Digioia's right to put on a defense.

### B. Right to Confrontation

Digioia argues that the court violated his right to confrontation when it precluded him from questioning Dr. Woods about her lack of qualifications. We disagree.

The right to confront witnesses is a critical right guaranteed to persons charged with crimes. Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The confrontation clause guarantees the right to conduct a meaningful cross-examination of witnesses, allowing a defendant to test a witness's "perception, memory, and credibility." Darden, 145 Wn.2d at 620. In the right to conduct a meaningful cross-examination, the Supreme Court held that this right is not absolute, as "[t]he confrontation right and associated cross-examination are limited by general considerations of relevance." Darden, 145 Wn.2d at 620-21. Appellate courts must apply a three-part test to determine whether a trial court violated a defendant's right to confront a witness by limiting the scope of cross-examination. State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017). The Supreme Court stated:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

Lee, 188 Wn.2d at 488 (quoting Darden, 145 Wn.2d at 622).

The first prong is reviewed for abuse of discretion, and if that is met, the second two prongs are reviewed de novo. Clark, 187 Wn.2d at 648-49. This analysis is similar

to that of the aforementioned right to put on a defense. A witness cannot be impeached by showing the falsity of his testimony concerning facts collateral to the issue. State v. Myers, 47 Wn.2d 840, 845, 290 P.2d 253 (1955). Additionally, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Therefore, because the cross-examination Digioia requested to perform was regarding a case of unrelated facts, and the judge thought the testimony would confuse the jury, the trial court made a reasoned determination to exclude the cross-examination. We decline to reverse reasoned decisions of the trial court. Thus, Digioia's right to confrontation was not violated.

C. Prosecutorial Misconduct

Digioia argues the prosecutor committed misconduct in closing argument by misstating the law on the definition of intent as required to find a defendant guilty of second degree assault of a child. We disagree.

A defendant claiming prosecutorial misconduct must establish that the challenged conduct was (1) improper, and (2) that the misconduct resulted in actual prejudice. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). A defendant's failure to object to the alleged misconduct constitutes a waiver of the issue on appeal unless the misconduct was "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). Because Digioia

objected to the prosecutor's discussion of intentional conduct, our review is for improper conduct and resulting prejudice.

To establish the first prong of the test, the defendant must show that it is "clear and unmistakable" that counsel committed misconduct. State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985). Where it can be shown that a prosecutor misstated the law, misconduct has occurred. Warren, 165 Wn.2d at 28. To establish the second prong of the test, even where a defendant proves improper conduct, a conviction will not be reversed unless the defendant can show actual prejudice. Warren, 165 Wn.2d at 26. In making this determination, the prejudicial effect of alleged misconduct will not be determined in isolation, rather, the prejudicial effect will be determined by placing the misconduct in the context of the total trial, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). For prejudicial error, there must be a "substantial likelihood the misconduct affected the jury's verdict." State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997).

To convict the defendant of second degree assault of a child, the State was required to prove that the defendant was 18 years of age or older, that he intentionally assaulted the child, that the child was under the age of 13, and that he recklessly inflicted substantial bodily harm. RCW 9A.36.021(1)(a); RCW 9A.36.130(1)(a). Because Digioia was alleged to have caused physical harm, the jury was instructed on what constitutes an actual battery:

> An assault is an intentional touching or striking of another person that is harmful or offensive regardless of whether any physical injury is done to

the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive.

WPIC 35.50.

The jury was instructed on intent in accord with the statute: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." WPIC 10.01; RCW 9A.08.010(1)(a).

The State began closing argument by telling the jury that the law is contained in the jury instructions. The State followed its discussion of Digioia's demeanor and attitude surrounding the event with a discussion on the law as applied in this case.

> The jury instructions tell you the definition of assault is it's an intentional touching or striking of another person that is harmful or offensive, regardless of whether any physical injuries occur. So what does that mean? That means that this was not an accident. He didn't trip and fall into her. He didn't—you know, he wasn't pushed, or tripped over a bookshelf and fell and landed on her. This was an intentional touching. All that means is that he didn't accidently make contact with her. He intended to touch her. And, obviously, you know—
>
> [DEFENSE COUNSEL]: Your Honor, I'm going to object. Counsel is misstating the definition of intentionally.
>
> [PROSECUTOR]: I can move on, your Honor.
>
> THE COURT: The jury has been advised that what the attorneys say is not law and is not evidence. You will have your instructions. You will refer to them. The objection is noted.
>
> [PROSECUTOR]: So an intentional, it's an intentional touching, meaning that he actually, he intended to make that contact with baby [H.D.] It wasn't an accident. And how do you know that he intentionally assaulted her? The jury instructions provide the instruction on intentionally. Intentionally says when you're acting with the objective to accomplish a result that constitutes a crime. So it's important to point out what is not in this instruction, what we do not have to prove. We do not have to prove that he intended to cause her pain. We don't have to prove that he intended to break a wrist. We don't have to prove that he intended to hurt her and make her cry. Because of course he didn't. Of course he didn't.

All we have to prove is that he intended—he acted with the objective or purpose to accomplish a result that constitutes a crime. And that is that he intended to pick her up and grab her. That he intended to grab her. It doesn't say that constitutes a crime and he knew it was a crime. It doesn't say constitutes a crime and he knew he was trying to hurt her. It just says to accomplish a result, and the result is the grabbing her.

The fact that it constitutes a crime, it doesn't mean that he has to know it. Because, think about that. The (inaudible) makes sense. And it's not as though he had to say I—I am intending to grab her, and when I intend to grab her, I am intending to break her rib and cause (inaudible). That's not what it says. It just says all we have to show is that he intended to grab her. And you know it was harmful because she was in fact injured.

Digioia contends that the law required the State to prove he intended to cause a harmful or offensive touching. However, that is not what the law requires. The law requires the defendant intend to commit the act, and that the act was harmful or offensive. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). Digioia need not intend the touching be harmful or offensive, just to intentionally touch. Cardenas-Flores, 189 Wn.2d at 269-70. Because the State did not misstate the law, there is no prosecutorial misconduct.

Affirmed.

_Mann, C.J._

WE CONCUR:

_Coburn, J._                    _Hazelrigg, J._

-13-