
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37975-2-IIII |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JARROD ALLAN AIRINGTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — Jarrod Airington appeals his conviction, following a jury

trial, of five felonies committed in July 2018.  We affirm the convictions but grant a

motion for resentencing in light of the invalidation by *State v. Blake*, 197 Wn.2d 170,

481 P.3d 521 (2021), of his four prior convictions for simple possession of a controlled

substance.

FACTS AND PROCEDURAL BACKGROUND

On a summer day in 2018, Brandon Craven, a homeless drug addict, agreed to drive Jarrod Airington's mother from Aberdeen to a house in Ocean Shores. There he met Mr. Airington for the first time. Because Mr. Craven was homeless, he took the opportunity to use the shower. Shortly thereafter, according to Mr. Craven, Mr. Airington pointed a semiautomatic pistol at him and accused him of stealing a "piece." Report of Proceedings (RP) at 485-86. A "piece" is a standard unit of heroin equivalent to about 25 grams, then worth about $1,200.

For hours thereafter, Mr. Craven claims he was stripped, restrained, threatened, and assaulted in various ways. He claims that Mr. Airington and two other men, TJ Seward and Brandon Jenkins participated, demanding that he tell them what he had done with the heroin. Mr. Craven denied having taken it. Eventually Mr. Airington told Mr. Craven they were going to take him somewhere else. As soon as he was taken outside, however, Mr. Craven ran, and was able to make it to the home of a friend, Ryan Dawson. Mr. Craven was talking nonsensically and Mr. Dawson observed that he had a black eye, a bruise on his arm, a fat lip, and his arm was bleeding. He gave Mr. Craven towels to staunch the bleeding and took Mr. Craven to the hospital.

At the hospital, Mr. Craven falsely reported to an officer that he had been jumped by a bunch of guys in Hoquiam. He lied, he later explained, because he had escaped and "didn't want anything else bad to happen" to him. RP at 504.

A couple of weeks later, Mr. Craven told officers with the Grays Harbor Sheriff's Department and Drug Task Force about being held and assaulted by Mr. Airington and others. His information provided the basis for a search warrant for drugs and evidence of the kidnapping and assault at the Ocean Shores house. Before executing the search warrant, officers waited for Mr. Airington to leave the house, which he did, driving a vehicle registered in his name that was located outside. A state highway patrolman conducted a traffic stop of Mr. Airington's car and he was arrested and taken to the county jail. Officers then obtained a warrant to search the car.

The search of the car turned up large quantities of heroin, methamphetamine, packaging materials, and scales in a backpack behind the driver's seat. Among items seized in the search of the house was a .22 revolver in the living room area. There were three bedrooms in the house, and in the middle bedroom, officers found 59 grams of methamphetamine. The officers also found "crib notes," (records prepared to keep track of transactions in narcotics) and rolls of currency totaling $8,000. Officers surmised that the middle bedroom was Mr. Airington's, because it contained clothing consistent with his size as well as correspondence to Mr. Airington and records relating to him, including a judgment and sentence from his most recent conviction.

Mr. Airington was charged with first degree kidnapping, second degree assault, two counts of possession of methamphetamine with intent to deliver, one count of possession of heroin with intent to deliver, and first degree unlawful possession of a

3

firearm. The two counts of possession of methamphetamine with intent to deliver

reflected the State's decision to charge, separately, the methamphetamine found in Mr.

Airington's car (count 3) and the methamphetamine found in the middle bedroom of the

house (count 6).

Defense counsel was never able to interview Mr. Craven because Mr. Craven did

not respond to interview requests, even after the court ordered a deposition. Mr. Craven

had been interviewed about the crimes by law enforcement three times, however, and the

defense was provided with the records of those interviews.

By the time of trial, the State had lost all contact with Mr. Craven and did not

expect him to testify. It had struck a plea agreement with TJ Seward, however, by the

terms of which Mr. Seward pleaded guilty to fourth degree assault and agreed to testify

truthfully about the alleged kidnapping and assault of Mr. Craven. Mr. Seward would

testify that while he participated "to some degree" in assaulting Mr. Craven, Mr.

Airington was the lead aggressor and was "calling the shots" throughout. RP at 160, 192.

The State had also procured a material witness warrant for Erick Knight, who could

testify that Mr. Airington asked him sometime following the kidnapping and assault if he

knew Brandon Craven. When Mr. Knight said he did, Mr. Airington told him that

Craven had "taken something from him and he was making him basically pay for it."

RP at 327. Mr. Knight could testify that Mr. Airington said he had knocked a retainer out

4

of Craven's mouth, beat him up and "stuck him a few times," but Craven still "[stuck] to his guns" and said "it wasn't him that did it."  RP at 328.

In opening statements, defense counsel outlined what he projected the State's evidence *would not* show.  But he conceded, speaking of the counts that charged Mr. Airington with possession with intent to deliver the methamphetamine and heroin found in the car, that the State would prove Mr. Airington at least *possessed* the drugs.  He stated, "I'm not going to—Mr. Airington is not going to insult your intelligence.  It was his vehicle.  He was unaware it was in his vehicle, but it was in his vehicle."  RP at 109.

In the State's case, during a break in the testimony of Darrin Wallace, a detective sergeant with the sheriff's department, the State notified the trial court outside the presence of the jury that an exhibit it would offer through the sergeant was expected to draw an ER 404(b) objection from the defense.  The exhibit, exhibit 72, was an evidence bag containing evidence of Mr. Airington's "dominion and control" found in the middle bedroom of the house.  RP at 265.  It would be offered to prove that the bedroom where the 59 grams of methamphetamine, crib notes and currency were found was Mr. Airington's.

Whether the middle bedroom was Mr. Airington's was a contested issue.  Mr. Airington was expected to call Mr. Jenkins, one of the residents of the house, to testify that the middle bedroom belonged to Mr. Airington's girlfriend and Mr. Airington was only there a couple of times a week.

5

The prosecutor explained that the anticipated ER 404(b) issue had to do with an

exhibit that was marked that morning, and continued:

> [PROSECUTOR]: Essentially it is evidence of indicia of dominion and control that was seized from the middle bedroom. One of the pieces of indicia that the officer seized I was looking at it last night in the evidence bag and I realized that it is Mr. Airington's felony judgment and sentence from his last conviction. So I let [defense counsel] know about that because I thought he might have some input as to how we're going to deal with the fact that mixed in with his other indicia is something that he might consider to be 404(b) evidence.

> THE COURT: For what crime?

> [PROSECUTOR]: I think it was a felony solicitation. So it was charged as a solicitation under [RCW] 69.50, I believe, to possess controlled substances. He got five years is my recollection. I haven't seen the document except through the bag.

> THE COURT: Okay. [Defense counsel?]

> [DEFENSE COUNSEL]: Your Honor, I think the way to handle this matter would be to have the bag opened—the evidence bag opened in open court, remove just the judgment and sentence and leave—

> THE COURT: Why? Why can't the jury see that?

> [DEFENSE COUNSEL]: Well, I think it's 404(b) evidence, Your Honor.

> THE COURT: Well, but the State—the State—unless your client is going to stipulate that that was his bedroom, he had dominion and control over everything in it, doesn't the State have the right to prove with any evidence available that—that that was, in fact, his bedroom and he had control over it?

> [DEFENSE COUNSEL]: They do. They have other indicia, Your Honor.

> THE COURT: But it's not up to me to decide what enough evidence is. If the State has additional evidence to prove that that was his bedroom, the fact that it may be a judgment and sentence may be the most powerful piece of evidence they have. Why would anybody keep a copy of a

6

judgment and sentence in—in a bedroom if it wasn't their own bedroom? I mean that's—that would be my argument if I were [the prosecutor].

So, Mr. [Prosecutor], unless you don't want to introduce that piece of evidence, I'm not going to exclude it. I think it's relevant and I think the relevancy outweighs any potential prejudice to Mr. Airington. The jury already knows that he has a criminal history. It's not like they think they're dealing with, you know, an 18-year-old kid that's never been down the road before.

[DEFENSE COUNSEL]: I understand.

THE COURT: Okay.

[DEFENSE COUNSEL]: I just wanted to make sure we made the record.

THE COURT: You made your record and I made my ruling.

RP at 265-67. Defense counsel did not draw the trial court's attention to the criminal history disclosed by the judgment and sentence. He did not cite ER 403 and argue that the availability to the jury of Mr. Airington's criminal history, which was extensive, presented a danger of unfair prejudice.

The questioning of Sergeant Wallace about exhibit 72 revealed that it was a sealed evidence bag that contained the dominion and control materials seized in the search of the middle bedroom. After it was offered and admitted over defense counsel's objection[1] the prosecutor asked the sergeant to unseal the bag and review its contents, and elicited the following testimony:

Q. [BY THE PROSECUTOR] All right. So whose name—what kind of indicia do we have there?

---

[1] Defense counsel limited his objection in the presence of the jury to, "I'll continue my objection, Your Honor." RP at 277.

A. What kind?

Q. Yes.

A. So Jarrod Airington's name is on most of it, not all of it. And we have some stuff from the Grays Harbor County courthouse, an omniview of some sort of prison document with his name on it, a certificate of recognition for Mr. Airington, White Bison Wellbriety program. It's a—some sort of credit card from Lenore Morquick (phonetic), a bill from Safeco Insurance for Jarrod Airington at 704 Rain Street, a temporary identification card for Jarrod Airington with a given address on this card, a Washington state offender card for Jarrod Airington, a picture of Jarrod Airington. This looks like just crib notes with several people's names on it and then two cards with Rachel Olson.

Q. Do you know who Rachel Olson is?

A. Rachel Olson is Mr. Airington's girlfriend. And then Superior Court judgment and sentence for Mr. Airington.

Q. Okay. Go ahead and put those back in the bag.

A. All back in here?

Q. If you can fit them, yeah.

A. (Witness complies.)

RP at 278-79.

During the defense case, defense counsel called Matthew Price, who had been "celled up" in jail with TJ Seward in late July 2018. RP at 387. Asked if Mr. Seward ever talked to him about Mr. Airington, Mr. Seward said yes. When defense counsel attempted to elicit testimony about what Mr. Seward said, however, it drew a hearsay objection that was sustained. When defense counsel attempted to elicit the same information with a "did you learn" question, the trial court excused the jury and, outside its presence, asked defense counsel to make an offer of proof. RP at 388.

8

Defense counsel made the following offer, leading to a further exchange with the court:

> [DEFENSE COUNSEL]: . . . I was intending to have Mr. Price testify that he knows TJ Seward and that TJ Seward, while they were incarcerated together, advised Mr. Price—told Mr. Price on multiple occasions and that Mr. Price learned—subsequently learned that TJ Seward would lie to the Court, would lie to the jury, would lie to anybody to make sure that he got off of his charges and make sure that Mr. Airington was convicted of the underlying offenses.
>
> THE WITNESS: Yeah.
>
> THE COURT: Is it going to be Mr. Price's testimony that Mr. Seward used those words that he said that or that—is that a conclusion that Mr. Price drew from some other context?
>
> [DEFENSE COUNSEL]: Both.
>
> THE COURT: Well, what's the other context?
>
> [DEFENSE COUNSEL]: That he drew—that he drew his own conclusions. I believe he learned also from other corroborating sources within the jail that that's what Mr. Seward was going to do.
>
> THE COURT: Well, how—how would that possibly be admissible? Now we're talking about hearsay two or three times removed, right?
>
> [DEFENSE COUNSEL]: We are. We're also talking about his own knowledge of what he knew and how he knew it.

RP at 388-89.

After additional discussion and input from the prosecutor, the trial court asked defense counsel to direct it "to some exception under Rule 801 that would allow Mr. Price to testify regarding statements made to him by Mr. Seward." RP at 392. Defense counsel eventually offered ER 801(d)(1), suggesting the statement to which Mr. Price would testify was inconsistent with Mr. Seward's testimony. Defense counsel had to

9

admit that he never asked Mr. Seward during cross-examination if he made such a statement to Mr. Price, however. Defense counsel then conceded that the trial court's ruling sustaining the objection was correct and excused Mr. Price without asking further questions.

Mr. Airington's other witness was Brandon Jenkins. In addition to testifying that the middle bedroom was not Mr. Airington's, Mr. Jenkins testified that it was Mr. Seward, not Mr. Airington, who assaulted Mr. Craven. He characterized Mr. Airington as having tried to calm things down. He admitted on cross-examination that this was inconsistent with what he had told police at the time.

After the defense rested, the prosecutor told the court he had limited testimony from Sergeant Wallace and some jail phone calls to offer in rebuttal. After some testimony from the sergeant, the trial court excused the jurors for the day, telling them there would be "relatively brief" evidence the next morning and they would probably begin their deliberations by 10:30 a.m. RP at 444.

The next morning, however, the prosecutor reported that Sergeant Wallace had been contacted by Mr. Craven after court the day before and the sergeant persuaded him to testify. The State intended to call him as a rebuttal witness. The prosecutor told the trial court that he understood he would need to "limit Mr. Craven's testimony to only rebut Mr. Airington's case and I'm fine with that." RP at 455. The court responded that in light of the fact that Mr. Jenkins's testimony had contradicted almost everything the

State presented through Mr. Seward, it doubted there would be any limitation on Mr. Craven's testimony.

The trial court asked defense counsel how much time he would need to interview Mr. Craven and defense counsel responded that he was "blind sided" by the development. RP at 457. He asked the trial court to dismiss the charges for mismanagement or to order a mistrial. The court denied the motions and allowed defense counsel from 9:30 a.m. to noon to interview Mr. Craven. On reconvening after lunch, the trial court asked defense counsel if he had sufficient time to interview Mr. Craven and counsel responded, "I think so." RP at 477.

Following the conclusion of the evidence, the trial court informed the parties before taking their objections and exceptions to jury instructions that it was going to dismiss count 6, the second charge for possession of methamphetamine with intent to deliver. The court had earlier expressed concern about having two charges for possession of methamphetamine on or about July 23rd. The court explained, "My ruling is that he can only be convicted of possessing [sic] of meth one time on July 23rd. And it doesn't matter how many different locations in which it was located." RP at 524.

The trial court had instructed the jury on lesser included charges on three of the counts. The lesser included offenses included: for kidnapping in the first degree, unlawful imprisonment; for assault in the second degree, fourth degree assault; and for the two possession with intent to deliver charges, simple possession. Defense counsel's

11

closing argument was largely devoted to trying to convince jurors that the State had

proved only the lesser included crimes. With respect to what was now only one count of

possession of methamphetamine with intent to deliver, defense counsel conceded that the

State proved possession:

> Did they prove their case beyond a reasonable doubt? I would say yes on
> possession of methamphetamine. I would say yes on possession of heroin.
> I would say yes on assault fourth degree. And I would say yes on unlawful
> imprisonment. Here's [sic] enough reasonable doubt in this case for you to
> render a verdict for a lesser included offense.

RP at 587.

Rejecting the defense argument, the jury found Mr. Airington guilty as charged.

He appeals.

During the pendency of the appeal, Mr. Airington moved this court to consider a

supplemental issue: he requested resentencing in light of the Washington Supreme

Court's February 2021 decision in *Blake*. The motion was referred to the panel.

## ANALYSIS

Mr. Airington's opening brief assigned error to the trial court (1) overruling his

ER 404(b) objection to allowing his judgment and sentence to be included in admitted

exhibit 72, (2) sustaining the State's objection to his effort to elicit Mr. Price's testimony

about Mr. Seward's statements, and (3) permitting the State to call Mr. Craven as a

rebuttal witness. His supplemental request for relief is for resentencing with an offender

12

score that has been corrected for *Blake*'s invalidation of some of his convictions. We

address the issues in the order stated.

I.       ADMISSION OF THE JUDGMENT AND SENTENCE INCLUDED IN EXHIBIT 72

Mr. Airington contends he was deprived of his right to a fair trial when the court

admitted a judgment and sentence that included his criminal history. He argues that he

sought to limit evidence of his criminal history by stipulating to having a prior conviction

(a predicate to the charge of unlawful possession of a firearm) as permitted by *Old Chief*

*v. United* States, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997). *Old Chief* and

its progeny require the court to accept a defendant's stipulation to a prior conviction

when the existence of a prior conviction is an element of the offense. He argues that he

further sought to limit evidence of his prior convictions by foregoing testifying, so that

the State could not question him about convictions admissible under ER 609(a). He

characterizes the State as having engaged in an end run around *Old Chief* and ER 609(a)

by making his *entire* criminal history available to the jury through the judgment and

sentence found in the search of the middle bedroom.

"Properly understood . . . ER 404(b) is a categorical bar to admission of evidence

for the purpose of proving a person's character and showing that the person acted in

conformity with that character." *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207

(2012). "[T]here is one improper purpose and an undefined number of proper purposes."

*Id.* at 421. No matter how sincere the State's intent to advance the evidence for its

13

*proper* purpose, it could be used by the jury for its improper purpose, so the trial court begins by assuming that evidence of bad acts is inadmissible. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). The trial court should then conduct an inquiry on the record and "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). We review a trial court's decision to admit evidence subject to ER 404(b) for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

The State offered the judgment and sentence and the other contents of exhibit 72 for a proper purpose: as evidence relevant to the contested issue of whether the middle bedroom was Mr. Airington's room. For that reason, and because Mr. Airington does not contest the genuineness of the judgment and sentence, he has no viable challenge that the first three requirements for admissibility under ER 404(b) were not met. His only argument is that the prejudicial nature of the judgment and sentence outweighed its probative value. He did not advance that argument with the required specificity in the trial court, however.

On appeal, he presents us with the criminal history that jurors would have seen if they removed the judgment and sentence from exhibit 72 and examined its second page.

14

No. 37975-2-IIII
*State v. Airington*

It reflected a significant criminal history, including many violent and drug-related crimes.[2] It could unquestionably have been prejudicial if seen by jurors. But while Mr. Airington argues on appeal that he "asked to exclude the old judgment and sentence *because it included Mr. Airington's criminal history*," Appellant's Opening Br. at 16 (emphasis added), that is not true. In his objection at trial, reproduced above, defense counsel said *nothing* about the criminal history included in the judgment and sentence.

---

[2] This reproduction of the criminal history appearing in the judgment and sentence is from the State's brief on appeal:

**2.2 Criminal History (RCW 9.94A.525):**

| Crime | Date of Crime | Sentencing Court (County & State) | A or J (Adult or Juvenile) | Type of Crime | Points |
|---|---|---|---|---|---|
| Burglary 2 | 4/9/87 | King 87-8-1784-4 | J | FB | .5 |
| TMVWOP | 3/1/88 | King 88-8-1087 2 | J | FC | .5 |
| Criminal Trespass 2 | 10/8/89 | King | A | M | |
| Assault 4 DV | 2/28/94 | Hoquiam | A | GM | |
| Assault 4 DV | 3/6/94 | Aberdeen | A | GM | |
| Obstructing | 4/7/94 | Aberdeen | A | GM | |
| UPF 2 | 3/9/94 | Grays Harbor 95-1-108-7 | A | FC | 1 |
| VUCSA (meth) | 5/27/94 | | A | FC | 1 |
| Assault 4 | 9/19/94 | Hoquiam | A | GM | |
| Resisting Arrest | 10/5/94 | Aberdeen | A | M | |
| Malicious Mischief 3 | 10/12/94 | Aberdeen | A | M | |
| VUCSA (meth) | 11/27/96 | Grays Harbor 97 1 2-8 | A | FC | 1 |
| UPF 2 | 8/1/97 | Grays Harbor 97 1 279-9 | A | FC | 1 |
| VUCSA (meth) | 2/5/99 | Grays Harbor 99-1-47-4 | A | FC | 1 |
| UPF 2 | 2/28/99 | Grays Harbor 99-1-121-7 | A | FC | 1 |
| Poss Stolen Property 2 | 2/23/01 | Grays Harbor 01 1 107-1 | A | FC | 1 |
| Resisting Arrest | 10/7/01 | Aberdeen | A | M | |
| Disorderly Conduct | 10/7/01 | Aberdeen | A | M | |
| VUCSA (meth) | 12/6/02 | Thurston 02-1-02105-4 | A | FC | 1 |
| Poss Short-Barreled Shotgun | 12/6/02 | | A | FC | 1 |
| UPF 1 | 12/6/02 | | A | FB | 1 |
| Poss of Dangerous Weapon | 4/14/03 | Grays Harbor | A | GM | |
| False Statement | 4/14/03 | Grays Harbor | A | GM | |
| Poss of Unlawful Weapon | 6/9/06 | Aberdeen | A | GM | |
| Assault 4 DV | 4/22/10 | Grays Harbor | A | GM | |
| UPF 2 | 3/20/11 | Grays Harbor 11-1-118-3 | A | FC | 1 |

* DV Domestic Violence was pled and proved.

Br. of Resp't at 15.

15

The only discussion about what crimes would be revealed was when the trial court asked what crime the judgment and sentence was for, and the prosecutor answered, "I think it was a felony solicitation," explaining, "I haven't seen the document except through the bag." RP at 266. It was in the context of having been told that the judgment and sentence would reveal a felony solicitation that the trial court said, "The jury already knows that he has a criminal history. It's not like they think they're dealing with, you know, an 18-year-old kid that's never been down this road before." RP at 267.

We note that there is little reason to believe the jurors removed the judgment and sentence from exhibit 72 and looked at its contents. By the time jury deliberations began, exhibit 72 had become irrelevant. Only one count of possession of methamphetamine with intent to deliver remained, and defense counsel had conceded that Mr. Airington possessed the methamphetamine, telling jurors, "Did [the State] prove their case beyond a reasonable doubt? I would say yes on possession of methamphetamine." RP at 587.

"A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial." *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). And if a document such as a judgment and sentence is offered in its entirety and only portions are objectionable, "an objection should specify the portions which are objectionable. It is not the judge's obligation to sort out the inadmissible evidence from

that which is admissible." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.11, at 62-63 (6th ed. 2016) (citing cases).[3]

The contention that the trial court should have excluded evidence of the criminal history reflected on the judgment and sentence included in exhibit 72 as unduly prejudicial was not preserved.

II.     MR. AIRINGTON WAS NOT DEPRIVED OF HIS RIGHT TO PRESENT A DEFENSE

Mr. Airington's next contention is that the trial court deprived him of his right to present a defense when it "prevented him from introducing evidence that [Mr. Seward] was willing to lie to get a deal from the prosecutor and to ensure Mr. Airington's conviction." Appellant's Opening Br. at 2. As recounted, defense counsel's efforts to elicit testimony from Mr. Price about what Mr. Seward said to him were objected to on hearsay grounds, and the objection was sustained. Defense counsel ultimately conceded at trial that the only basis he could identify for admitting the testimony—as a prior inconsistent statement under ER 801(d)(1)—did not apply, since he did not ask Mr. Seward if he ever made such a statement.

---

[3] Since exhibit 72 was an exhibit bag containing multiple items, there is no reason to believe that a copy of the judgment and sentence was before the trial court when it ruled on Mr. Airington's narrow objection, even if the court had otherwise been provided with copies of the parties' proposed exhibits. For the trial court to appreciate the argument about the prejudicial criminal history that is raised for the first time on appeal, it was incumbent upon Mr. Airington to provide the court with a copy of the judgment and sentence.

On appeal, Mr. Airington argues that the application of the hearsay rule deprived him of his right to present a defense. The latitude of states to make and apply rules excluding a criminal defendant's evidence "has limits. 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984))).

Article I, section 22 of the Washington Constitution guarantees criminal defendants a right to present testimony in their defense that is equivalent to the right guaranteed by the United States Constitution. *See State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). A claimed violation of the Sixth Amendment right to present a defense is reviewed de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

Evidence rules impermissibly abridge a criminal defendant's right to present a defense if they are "'arbitrary' or 'disproportionate' and 'infringe[ ] upon a weighty interest of the accused.'" *State v. Rafay*, 168 Wn. App. 734, 796, 285 P.3d 83 (2012) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)). In the

exceptional case where an evidence rule abridges a defendant's right to present a defense, we must disregard the rule in order to protect the paramount constitutional right.

Mr. Airington makes a conclusory argument that the application of ER 801 deprived him of his right to present a defense, but without explaining or providing legal authority that this is the exceptional case in which the constitutional right to present a defense applies.

The rules of evidence do not fall by the wayside any time a defendant can argue on appeal that otherwise-inadmissible evidence would have advanced his defense. Essential to the constitutional argument is the defendant's ability to show that applying the challenged evidentiary rule presents exceptional risks of arbitrariness and disproportionality. A constitutional argument that cites only general constitutional ideas without specific citations and support is inadequate. *State v. Barry*, 183 Wn.2d 297, 313, 352 P.3d 161 (2015); RAP 10.3(a)(6). The assignment of error does not warrant consideration.

III.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING MR. AIRINGTON'S MOTION TO DECLARE A MISTRIAL

Mr. Airington next argues that the court deprived him of a fair trial when it allowed the prosecution to call Mr. Craven after Mr. Airington had presented his defense. The relief he requested when Mr. Craven's availability to testify in the rebuttal case was reported was only a dismissal for state mismanagement or a mistrial, claiming "there is

no way that I can be prepared this . . . week for Mr. Craven." RP at 458. The trial court

rejected the argument of lack of preparedness out of hand, stating, "[W]hen this trial

started . . . you didn't know whether Mr. Craven was going to be here to testify or not"—

no one knew, according to the court, so "everyone came here prepared to hear testimony

from Mr. Craven, because the State was making what I believed to be diligent efforts to

locate him." RP at 458.[4]

Mr. Airington makes no argument on appeal that state mismanagement reasonably

required the trial court to dismiss the charges against him. He does argue that "[a]t the

very least, the court needed to grant the motion for a mistrial." Appellant's Opening Br.

at 36.[5]

The remedy of a mistrial is not specifically mentioned in the civil rules, and it may

be ordered for a variety of reasons. 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE:

CIVIL PROCEDURE, § 30.42, at 310-11 (3d ed. 2018). A trial court should grant a mistrial

---

[4] On the morning of the first day of trial, the court asked the prosecutor if Mr. Craven would appear and the prosecutor answered, "As of right now, I don't think so." RP at 15. The trial court told the prosecutor, "[I]f he does, as we've already discussed, I'm going to permit [defense counsel] time to either depose or interview him." *Id.*

[5] For the first time on appeal, Mr. Airington characterizes the trial court, by allowing Mr. Craven to be called in rebuttal, as allowing the State to "reopen" its case. Appellant's Opening Br. at 30, 33-34. Clearly the State did not believe it was reopening its case; it never made a motion for leave to reopen. Nor did Mr. Airington argue below that the State was reopening its case. The word "reopen" does not appear in the trial transcript. If an argument could have been made that allowing Mr. Craven to testify as a rebuttal witness was *tantamount* to reopening the State's case, it was not preserved. *See* RAP 2.5(a). We will not consider it.

"only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "A denial of a motion for mistrial should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010) (citing *State v. Greiff*, 141 Wn.2d 910, 921, 10 P.3d 390 (2000)).

Mr. Airington argues that without testimony in the State's case-in-chief from Mr. Craven, Mr. Airington could focus on the unreliability of Mr. Seward's incentivized testimony, but once Mr. Craven appeared that strategy failed—Mr. Craven could corroborate Mr. Seward's version of events. Mr. Airington does not explain how this alleged blow to his trial strategy arose only because Mr. Craven was not called in the State's case-in-chief, however. If Mr. Craven had been called on the first day of trial, his testimony would have presented the same problem for a defense trial strategy focused on discrediting Mr. Seward.

No prejudice was shown, and the trial court did not abuse its discretion by denying the request to declare a mistrial.

IV.     UNCERTAINTY ABOUT WHETHER A REDUCED OFFENDER SCORE WOULD HAVE
        AFFECTED THE SENTENCE WARRANTS REMAND FOR RESENTENCING

Finally, Mr. Airington has moved us to order resentencing in light of the Supreme

Court's decision in *Blake*, because of four now-void convictions included in calculating

his offender score.

In *Blake*, the Washington Supreme Court held that RCW 69.50.4013(1), the

simple drug possession statute, "criminalize[s] innocent and passive possession, even by

a defendant who does not know, and has no reason to know, that drugs lay hidden within

something that they possess." 197 Wn.2d at 195. It held the statute "violates the due

process clauses of the state and federal constitutions and is void." *Id.* "A statute or

ordinance which is void as being in conflict with a prohibition contained in the

constitution is of no force and effect." *City of Seattle v. Grundy*, 86 Wn.2d 49, 50, 541

P.2d 994 (1975).

At sentencing, the court found the free crimes aggravator based on an offender

score of "at least 16 on all five counts." Clerk's Papers at 23. Mr. Airington has four

prior convictions for simple possession that will no longer count toward his score.

Reducing the offender score listed on the judgment and sentence by those 4 points results

in a score of 10. However, it is possible that a conviction that the State told the court it

had not yet confirmed was erroneously included in that number, in which case his new

offender score would be 9.  With an offender score of 9, the free crimes aggravator would no longer apply.

When Mr. Airington filed his motion requesting that we order resentencing, the State was invited to submit a response.  It chose not to do so.  Given uncertainty whether the trial court would have made a different sentencing decision if the imprecise offender score was four points lower, we grant the motion for resentencing.

We affirm the convictions and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Staab, J.

23