# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>    v.<br><br>M.B.,<br><br>    Appellant. | No. 59338-6-II<br><br>UNPUBLISHED OPINION |

CHE, J. — MB and KB attended their high school homecoming dance together.  KB had several alcoholic drinks throughout the evening and became significantly intoxicated.  The next day, MB asked KB if she remembered having intercourse with him in his car.  A few weeks later, KB reported the incident to law enforcement, and the State charged MB with second degree rape based on KB's incapacity to consent.

Following a bench trial, the trial court found MB guilty.  MB appeals, arguing that the trial court erred by excluding evidence of KB's sexual relationship with a previous boyfriend, insufficient evidence supported his adjudication, and he received ineffective assistance of counsel.  We disagree and affirm.

### FACTS

MB and KB attended their high school homecoming dance together.  After the dance, they went to a party together.  Throughout the evening, KB had multiple alcoholic drinks,

leading her to become significantly intoxicated. At the end of the night, MB had intercourse with KB in his car.

The State charged MB with second degree rape based on KB's incapacity to consent. The case proceeded to a bench trial where MB argued the affirmative defense that he reasonably believed KB had the capacity to consent.

The State filed a motion in limine to exclude questioning regarding KB's sexual history. In response, MB argued that evidence regarding KB's prior sexual relationship with a previous boyfriend was admissible to show KB's motive to falsely accuse MB of rape. MB argued that during her interview with law enforcement, KB told the officer that she had a previous boyfriend who she believed only dated her so he could have intercourse with her and then dumped her. KB told the officer that MB eventually did the same thing to her. The trial court granted the State's motion and excluded the evidence of KB's sexual acts during her prior relationship. The trial court explained, "I find that the sexual acts that were with her prior boyfriend are completely protected by rape shield. There's no allegation that there was any type of similarity or accusation of rape in that case, and this is exactly what the statute was made for." 1 Rep. of Proc. (Mar. 28, 2023) (RP) at 6.

KB testified that she and MB went to high school together. When she was a sophomore, they started hanging out more at school and at his house. Their relationship progressed, and they started having intercourse about twice a week for a couple of weeks prior to the homecoming dance. The night of the dance, KB and MB planned to go with their friends Gary and Mariah to dinner, the dance, and then a party afterwards. The group started taking swigs from a vodka bottle in the parking lot before the homecoming dance.

They only stayed at the dance for a short time before leaving for a party at their friend's house, Manuel. At the party, KB consumed more vodka She recalled feeling "loopy" and struggling to keep her balance while walking. RP at 34. KB and MB left the party to drop Mariah at the high school. KB could not remember much from the car ride but recalled feeling nauseous and like her head was spinning. After dropping off Mariah, MB and KB returned to the party. KB laid down on a couch because she did not feel well. Eventually she realized it was nearing her curfew and asked MB to take her home. KB's memory of the end of the night was faint. It was possible KB agreed to have intercourse with MB that night, but she did not know.

The following day, KB and MB were having a conversation. KB thanked him for taking her home and told him "I'm glad that we didn't do anything while I was like that drunk." RP at 45. MB informed KB that they had had intercourse in his car. KB did not know what to say, and MB explained that she "wanted it." RP at 46. KB felt disgusting at the revelation. Later in the day, as her hangover subsided, she recalled moments from the night before including her cheek against the car door and the feeling of being pushed into the door repeatedly.

Shortly thereafter, KB and MB stopped talking or hanging out. KB recalled being upset at MB. During an interview with law enforcement after she reported the rape, KB told an officer that she had been upset with MB for ending things with her. KB told the officer that all MB wanted was to have intercourse with her and then leave her. A few days after MB ended things with KB, she reported the rape.

Mariah testified that she saw KB drinking before the dance and at the party. She recalled KB "falling all over the place" and "couldn't really talk" because she was drunk. RP at 90, 92. When MB and KB drove Mariah back to the high school, KB was loud and flailing around in the

3

car. After the party, people started using the phrase "don't get [KB] drunk" in reference to how drunk KB was at the party. RP at 96.

MB testified that, at the party, it was noticeable that KB had had a few drinks, but she did not appear "drunk to an extreme." RP at 119. MB recalled taking Mariah back to the high school and then immediately driving KB to her house. MB recalled that on the drive to her house, KB asked him multiple times to pull over so they could have intercourse. MB believed KB was capable of understanding what was going on, could hold a stable conversation, and was walking perfectly fine. MB pulled over, and KB crawled into the backseat and began undressing herself. MB initially declined KB's advances, but eventually gave in and the two had intercourse. MB took KB home afterwards.

MB testified that the day after homecoming he asked KB if she remembered what happened the night before. KB told him she did not remember. MB and KB continued their sexual relationship as normal for another two weeks. MB started to feel like KB got too close to him and made him uncomfortable, so he ended the relationship. KB became very upset, called him names, and sent him messages on his phone and on social media. MB ultimately blocked KB from contacting him.

The trial court found MB guilty and entered the following written findings of fact:

1. On October 16, 2021 and October 17, 2021, [KB] and [MB], the respondent, attended a homecoming dance in Clark County, Washington.

2. After the homecoming dance, [KB] and [MB] attended a party at another minor's residence.

3. In between that time, [KB] consumed several drinks and was away from [MB] during several periods of time that day. [MB] likely did not see all drinks [KB] consumed. [KB] was dancing and acting intoxicated at the party.

4

4.      Both parties indicated they had sexual intercourse.

5.      [MB] indicated when specifically asked that he was the one who asked [KB] if she remembered that they had sexual intercourse, showing that he knew she was mentally incapacitated. In many respects, that alone is sufficient.

6.      [KB] was mentally incapacitated from the drinks she had. That does not mean she was blacked out, but that she was too incapacitated to make a decision and understand the ramifications of her actions that day.

7.      [KB] could have agreed to have sexual intercourse with [MB] that day and still would have been incapacitated.

8.      [MB]'s description of the intercourse made it sound like [KB] sexually assaulted him. The Court did not find this claim credible.

9.      [KB] made a choice to continue to have a relationship with someone who did this to her. However, arguments about [KB] continuing to have intercourse with [MB] after that night are based on a fallacy. There is not one way that someone acts after being sexually assaulted.

Clerk's Papers at 21-22.

Based on these findings of fact, the trial court concluded that KB was too incapacitated to consent to sexual intercourse, MB did not establish by a preponderance of the evidence that he reasonably believed KB had the ability to consent, and MB was guilty of second degree rape.

MB appeals.

ANALYSIS

I. CROSS-EXAMINATION OF KB

MB argues that the trial court erred by granting the State's motion in limine limiting him from cross-examining KB as to her sexual acts in a prior relationship with an ex-boyfriend. He argues that the exclusion of the evidence was an abuse of discretion and also violated his constitutional right to present a defense and to confrontation and cross-examination. We disagree.

A. *Abuse of Discretion*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). An abuse of discretion occurs when an evidentiary decision was manifestly unreasonable or based on untenable grounds or reasons. *Id*. The admissibility of past-sexual-behavior evidence is within the sound discretion of the trial court. *State v. Hudlow*, 99 Wn.2d 1, 17-18, 659 P.2d 514 (1983) (citing *State v. Blum*, 17 Wn. App. 37, 46, 561 P.2d 226 (1977). "The exercise of discretion in balancing the danger of prejudice against the probative value of the evidence is also a matter within the trial court's discretion, and should be overturned only if no reasonable person could take the view adopted by the trial court." *Id*. at 18.

1. *Exclusion Under Rape Shield Statute*

Here, the trial court based its decision to exclude evidence of KB's sexual acts in a prior relationship on the rape shield statute . The rape shield statute bars the admission of evidence of a victim's past sexual behavior to prove credibility or consent, except as provided in subsection (3). Former RCW 9A.44.020(2) (2013). Past sexual behavior includes but is "not limited to the victim's marital history; divorce history; [or] general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards." Former RCW 9A.44.020(2) (2013). "The purpose of the rape shield statute is to prevent prejudice arising from promiscuity and by suggesting a 'logical nexus between chastity and veracity.'" *State v. Sheets*, 128 Wn. App. 149, 155, 115 P.3d 1004 (2005) (quoting *State v. Peterson*, 35 Wn. App. 481, 485, 667 P.2d 645 (1983). Under former RCW 9A.44.020(3) (2013), a victim's past sexual behavior may be admitted to prove the victim's consent after the trial court conducts a balancing test to determine

if the evidence proposed to be offered by the defendant regarding the past sexual behavior of the victim is relevant to the issue of the victim's consent, is not inadmissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, and that its exclusion would result in denial of substantial justice to the defendant. Former RCW 9A.44.020(3) (2013).

Here, MB did not seek to introduce evidence of KB's sexual acts in a prior relationship with a different partner to prove her consent to intercourse with MB. He claims he sought to introduce it to support his theory that KB fabricated the rape allegation because she was mad he had ended their relationship, MB claims KB's anger at him was aggravated because she was mad that a previous partner had ended that prior relationship in a similar way. He argued that KB's anger over MB ending their relationship was "the biggest reason to doubt [her] credibility." RP at 152. The trial court's exclusionary ruling specifically excluded evidence of KB's *past sexual behavior* in her prior relationship. MB could still have introduced evidence that KB was in a prior relationship, was upset when it ended, and it generally ended under similar circumstances. He could have drawn parallels between that relationship and her relationship with MB. But to the extent MB sought to introduce the specific evidence of KB's past sexual behavior to undermine her credibility, that evidence is prohibited by the rape shield statute.

Even where evidence is prohibited by the rape shield statute, the rape shield statute cannot be used to bar evidence of extremely high probative value. *State v. Jones*, 168 Wn.2d 713, 723, 230 P.3d 576 (2010). But that is not the case here. Introducing the specific evidence of KB's sexual behavior in that prior relationship had minimal bearing, at best, on MB's theory that KB was upset when he ended their relationship. Nothing in the trial court's ruling prevented

MB from arguing that KB was particularly mad at MB ending their relationship because she had also recently experienced a similar breakup with someone else. Viewing all of the evidence in context, specific evidence of KB's sexual behavior in the prior relationship was not of the "extremely high probative value" contemplated in *Jones*, and we hold that the trial court did not abuse its discretion by applying the rape shield statute to exclude it.

2. *Harmless Error*

Moreover, even if MB could show that the trial court's exclusionary ruling was an abuse of discretion, we hold that any error was harmless. As discussed below, we hold that the exclusion of the evidence did not violate MB's right to present a defense or to confront and cross-examine a witness; therefore, we apply the nonconstitutional harmless error standard to determine whether the trial court's alleged evidentiary error was harmless. *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015). Under this standard, a defendant must show a reasonable probability that, absent the error, the outcome of the trial would have been materially affected. *Id.* at 317-18.

MB fails to carry this burden. MB's defense theory was that he had reason to believe KB was not incapacitated when they had intercourse. The trial court heard testimony from KB, Mariah, and MB as to KB's drinking that night and her behavior. The trial court found that KB was incapacitated. Whether KB had intercourse within a previous relationship and was upset when that previous relationship ended has no bearing on whether KB was incapacitated on the night she and MB had intercourse. On this record, MB fails to show a reasonable probability that, had the excluded evidence been allowed, the outcome of the trial would have been

8

materially affected. Accordingly, any alleged error in the trial court's exclusionary ruling was harmless.

B.       *Right to Present a Defense*

We review de novo whether the trial court violated a defendant's right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022).  Although "[a] criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions," that right is not absolute. U.S. Const. amend. VI; Const. art. I, § 22; *see also Jennings*, 199 Wn.2d at 63.  Judges have the discretion to "'exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'"  *Id*.  (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).  Only relevant evidence is subject to constitutional protection. *State v. Jones*, 168 Wn.2d at 720.  We must weigh the State's interest in excluding the evidence against the defendant's right to produce relevant evidence. *Jennings*, 199 Wn.2d at 63.

MB contended that evidence of KB's sexual acts during a previous relationship were relevant because the circumstances related to the end of that relationship made her angry and more susceptible to anger at MB when he later ended their relationship under similar circumstances.  This evidence of sexual acts during a previous relationship is minimally relevant at best.  The right to introduce such minimally relevant evidence is reasonably limited where that evidence is prejudicial or risks confusion of the issues.  Additionally, we agree with the State that the State has a compelling interest in protecting rape victims, encouraging their reporting and

9

cooperation in the investigation and prosecution of offenders. In this instance, the State's interest outweighs MB's right to produce minimally relevant evidence.

Moreover, the trial court's exclusion of this evidence had little impact on MB's ability to offer evidence to support his defense theories. *See State v. Arndt*, 194 Wn.2d 784, 814, 453 P.3d 696 (2019). MB was not hindered in his ability to present evidence supporting his core defense—that he reasonably believed KB was not incapacitated when they had intercourse.

Additionally, MB was able to present evidence that KB was angry at him for ending their relationship. MB elicited testimony from KB that she was angry about the way MB treated her. The court heard testimony that KB "went off" on MB, MB blocked KB on social media and his phone and, and KB reported the rape shortly after MB ended their relationship. RP at 76. MB argued at length that KB's anger over MB ending their relationship was "the biggest reason to doubt [her] credibility." RP at 152. And nothing in the trial court's ruling prohibited MB from introducing evidence that KB was upset when her previous relationship ended and was similarly upset when her relationship with MB ended. That KB was upset with MB was well established without the introduction of minimally relevant evidence about her sexual activity in her prior relationship.

In sum, we hold that the trial court did not violate MB's right to present a defense but rather properly exercised its gatekeeping function.

C.    *Confrontation Right*

Related to the right to present a defense, the Sixth Amendment also provides individuals with the right to confront adverse witnesses. U.S. Const. amend. VI; *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002); *see also State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514

(1983) ("The sixth amendment to the United States Constitution and Const. art. I, § 22 grant criminal defendants two separate rights: (1) the right to present testimony in one's defense, and (2) the right to confront and cross-examine adverse witnesses") (internal citations omitted). "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." *Darden*, 145 Wn.2d at 620.

Meaningful cross-examination is essential to ensure witnesses are credible and that the fact-finding process is accurate. *Id.* While the right is zealously guarded, "'[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *State v. Lee*, 188 Wn.2d 473, 487, 396 P.3d 316 (2017) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed. 2d 674 (1986)).

For the same reasons that we hold the trial court's ruling did not violate MB's right to present a defense, we also hold that the trial court did not violate MB's right to confrontation. As established, the excluded evidence had minimal probative value, and the State's interests in protecting rape victims outweighed MB's need for the information sought. The evidentiary ruling had minimal impact on MB's ability to argue his defense theories. MB was able to thoroughly cross-examine KB about the events of the night in question as well as her reaction a few weeks later when MB ended their relationship. And nothing in the trial court's ruling prohibited MB from introducing evidence about the end of KB's prior relationship.

Under these circumstances, and given the evidence's minimal probative value and the State's interest in excluding it, the trial court did not violate MB's right to confrontation when it

prevented MB from cross-examining KB about her sexual acts during a prior relationship with a different partner.

## II. INSUFFICIENT EVIDENCE

To support an adjudication of second degree rape, the State had to prove beyond a reasonable doubt that MB, under circumstances not constituting rape in the first degree, engaged in sexual intercourse with KB when she was incapable of consent by reason of being physically helpless or mentally incapacitated. RCW 9A.44.050(1)(b). Mental incapacity is defined as "that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(7).

"[F]ollowing a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id.* at 106 (quoting *State v. Stevenson*, 128 Wn. App 179, 193, 114 P.3d 699 (2005)). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds by *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19

(2017). A defendant challenging the sufficiency of the evidence "admits the truth of all of the State's evidence." *Id*. We draw "reasonable inferences in the State's favor." *Id*. at 266. "We consider both circumstantial and direct evidence as equally reliable and defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Hernandez*, 172 Wn. App. 537, 543, 290 P.3d 1052 (2012).

To that end, when a person testifies that the defendant raped them and the defendant testifies that the intercourse was consensual, "[i]t is the role of the [fact finder] to weigh the credibility of this testimony, along with any surrounding facts and circumstances tending to support or discount the two conflicting accounts." *State v. Bright*, 129 Wn.2d 257, 272, 916 P.2d 922 (1996).

A. *Incapacity to Consent*

MB argues that insufficient evidence supported the trial court's findings of fact 5, 6, and 7 and its conclusion of law that KB was too incapacitated to consent. We disagree.

MB's own testimony provides sufficient evidence to support finding of fact 5. He testified that he asked KB if she remembered the events of the night before, which logically supports the inference that he was aware that she was incapacitated at the time. And KB's testimony corroborated that fact.

As to finding of fact 6, that KB was mentally incapacitated from the drinks she had, there was some conflicting testimony. KB, Mariah, and MB each testified to KB consuming multiple drinks that night. KB and Mariah's testimony describe KB's behavior that night as exhibiting a high level of intoxication; she was falling over and slurring her words. Mariah testified that KB's behavior that night gave rise to the use of the phrase "don't get KB drunk" among their peers.

While MB's testimony described KB's behavior as relatively normal and not indicative of intoxication, the trial court found his testimony on that topic not credible. In a sufficiency challenge, we take the State's evidence as true, and we defer to the fact finder on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *Hernandez*, 172 Wn. App. at 543.

Finding of fact 7 is also supported by the record. As previously discussed, sufficient evidence supported the trial court's finding that KB was mentally incapacitated from the drinks she had. That KB could have said she agreed to have intercourse with MB that day and still would have been incapacitated is consistent with the definition of mental incapacity. *See* RCW 9A.44.010(7). The record supports the finding that KB may have said she agreed to intercourse with MB but it also supports the finding that she was nonetheless mentally incapacitated due to her intoxication such that she could not understand the nature or consequences of the act of intercourse.

Viewing the evidence in the light most favorable to the State, and taking all of the State's evidence as true, sufficient evidence supports the trial court's findings of fact. And the trial court's findings support its conclusion that KB was too incapacitated to consent to the sexual intercourse with MB.

B.      *Affirmative Defense*

MB also argues that insufficient evidence supported the trial court's conclusion that MB had failed to establish his affirmative defense that he reasonably believed KB had the ability to consent. We disagree.

A defendant may assert as a defense to any charge of rape based on the victim's mental incapacity or physical helplessness that "at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless." RCW 9A.44.030(1). This defense does not require the defendant "to prove that the victim could actually consent," only that the defendant "reasonably believed [the victim] could consent." *State v. Lozano*, 189 Wn. App. 117, 124, 356 P.3d 219 (2015). "[I]f the State proves beyond a reasonable doubt that a person cannot consent to sexual intercourse, the victim's words or conduct indicating freely given agreement to have sexual intercourse will not excuse the defendant's conduct." *Id*. at 125. But this evidence could still be relevant to support the defendant's reasonable belief defense, which must be proved by a preponderance of the evidence. RCW 9A.44.030(1); *Lozano*, 189 Wn. App. at 125-26 n.6.

MB testified that he asked KB the day after homecoming if she remembered what happened that night. That testimony was consistent with KB's recollection of their conversation. That MB questioned whether KB remembered the night before indicates that he believed she was significantly incapacitated at the time. Further, in its oral ruling, the trial court specifically found that MB's testimony that KB did not appear intoxicated was not credible. Additionally, Mariah testified that at the party KB was "falling all over the place" and "couldn't really talk" because she was drunk. RP at 90, 92. Mariah testified that after the party, people started using the phrase "don't get [KB] drunk" in reference to how drunk KB was at the party, showing that people in attendance at the party—such as MB—were witnesses to KB's behavior. RP at 96.

15

Taking the evidence in the light most favorable to the State, sufficient evidence supported the trial court's findings and its conclusion that MB failed to show he reasonably believed KB had the ability to consent.

### III. ORAL RULING

MB also argues that remand for clarification is necessary due to an apparent conflict between the trial court's oral ruling and its written findings and conclusions. We disagree.

A trial court's oral opinion has no final or binding effect unless formally incorporated into written findings, conclusions, and judgment. *State v. Friedlund*, 182 Wn.2d 388, 394-95, 341 P.3d 280 (2015). To the extent that the trial court's oral ruling conflicts with its written order, the written order controls. *State v. Skuza*, 156 Wn. App. 886, 898, 235 P.3d 842 (2010). Similarly, where written findings are unambiguous, "they are not susceptible to being given a different meaning on appeal through resort to an examination of the lower court's oral ruling." *State v. A.M.*, 163 Wn. App. 414, 424, 260 P.3d 229 (2011).

Here, the trial court's written findings and conclusions did not formally incorporate its oral opinion. Nor is there any ambiguity in the written order. Moreover, the alleged conflict between the trial court's oral ruling and its written findings and conclusions is nothing more than a minor misstatement or perhaps a minor scrivener's error in the transcript. In its oral ruling, the trial court clearly laid out its findings of fact, which were consistent with its written order. At the very end of its oral ruling, the trial court summarized its legal conclusions, "My conclusion of law is that [KB] was too incapacitated to consent; that the burden was met by preponderance that [MB] reasonably believed that she had the ability to consent; and that he's in fact guilty of rape in the second degree under that prong." RP at 169. Given the clarity of the trial court's written

16

findings and conclusions, and their consistency with the whole of the court's oral ruling, it is clear that the trail court intended to say "that the burden was *not* met by preponderance."

Remand for clarification is unnecessary.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

MB also argues that he received ineffective assistance of counsel based on his counsel's failure to call witnesses or procure expert testimony. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Ineffective assistance of counsel is a two-pronged inquiry. *Grier*, 171 Wn.2d at 32. To prevail, MB must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. *Id*. at 32-33. A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Appellate courts apply "exceptional deference" when "evaluating counsel's strategic decisions," and "[i]f trial counsel's conduct can be characterized as legitimate trial strategy or tactics," it will not support a claim of ineffective assistance. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). The defendant must also prove prejudice, such that, but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *Id*.

No. 59338-6-II

For failure to call witnesses to amount to ineffective assistance of counsel, that failure must have been unreasonable and must result in prejudice or create a reasonable probability that, had the lawyer presented witnesses, the outcome of trial would differ. *State v. Sherwood*, 71 Wn. App. 481, 484, 860 P.2d 407 (1993). MB fails to carry this burden. While he identifies potential witnesses that could have been called, nothing in the record demonstrates that those witnesses would have provided testimony helpful to his defense, let alone that it would have reasonably changed the outcome of the trial. His ineffective assistance of counsel claim fails.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Glasgow, J.

18